**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**William E. MILLER, William L. Phillips, and Sherry J. Mitchell,**
**Defendants–Appellants.**

Nos. 91–1836, 91–1837.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 11, 1991.
Decided May 11, 1992.

Christina McKee, Asst. U.S. Atty. (argued), Office of the U.S. Atty., Indianapolis, Ind., for plaintiff-appellee.

James C. McKinley (argued), James C. McKinley, Richard L. Ford, Tabbert & Ford, Indianapolis, Ind., for defendants-appellants William E. Miller and William L. Phillips.

Jeffrey Baldwin (argued), Indianapolis, Ind., for defendant-appellant Sherry J. Mitchell.

Before FLAUM and RIPPLE, Circuit Judges, and WILL, Senior District Judge.*

WILL, Senior District Judge.

William Miller, William Phillips, and Sherry Mitchell were charged under a 37 count indictment for their roles in a scheme to defraud the Department of Housing and Urban Development (HUD).[1] Count One charged all defendants with conspiring to make false statements to obtain HUD-insured loans in violation of 18 U.S.C. § 371. The remaining counts charged individual defendants with making various false statements or aiding and abetting the making of false statements in violation of 18 U.S.C. §§ 1010[2] and 2.

Miller and Phillips pleaded guilty. Miller was sentenced to 21 months, two years supervised release, and ordered to pay $50,000 in restitution to the United States. Phillips was sentenced to 24 months, three years supervised release and also ordered to pay $50,000 in restitution. Mitchell went to trial and was convicted. She was sentenced to three years probation and ordered to pay $10,000 in restitution. The district court granted her motion to stay execution of the sentence pending her appeal.

In this consolidated appeal, Miller and Phillips challenge their respective sentences, arguing that the district court erred in increasing their base offense levels under § 2F1.1 of the sentencing guidelines for losses experienced by HUD. They also argue that the court erred in increasing their offense levels for being organizers or leaders under § 3B1.1(a) of the guidelines. Mitchell appeals contending that the district court erred in giving a conscious avoidance instruction, and that the evidence was insufficient to support her conviction. We affirm.

---

* The Honorable Hubert L. Will, Senior District Judge of the United States District Court for the Northern District of Illinois, is sitting by designation.

1. Brian Ahern and Barbara Pumphrey were also indicted. Pumphrey was sentenced after a guilty plea and is not involved in this appeal. The district court granted Ahern's motion for an acquittal after a jury returned a guilty verdict. *See United States v. Miller*, 761 F.Supp. 1368 (S.D.Ind.1991).

2. Section 1010 provides: Whoever, for the purpose of obtaining any loan or advance of credit from any person, partnership, association, or corporation with the intent that such loan or advance of credit shall be offered to or accepted by the Department of Housing and Urban Development for insurance or for the purpose of obtaining any extension or renewal of any loan, advance of credit, or mortgage insured by such Department, or the acceptance, release, or substitution of any security on such a loan, advance of credit, or for the purpose of influencing in any way the action of such Department, makes, passes, utters, or publishes any statement, knowing the same to be false, or alters, forges, or counterfeits any instrument, paper, or document, or utters, publishes, or passes as true any instrument, paper or document, knowing it to have been altered, forged, or counterfeited, or willfully overvalues any security, asset, or income, shall be fined not more than $5000 or imprisoned not more than two years, or both.

## I. BACKGROUND

Beginning in 1985, Miller and Phillips were in a real estate business in Lafayette Indiana, along with a third (unindicted) associate, Christopher Wood. The business included buying residential properties for renovation and rental or resale. The properties involved in this case were three buildings, 43, 45 and 51 West Fall Creek Parkway, located in Indianapolis, Indiana. Each property contained four apartment units. The plan was to renovate these buildings and sell them as twelve condominiums.

After efforts at obtaining financing for the project through conventional channels proved unsuccessful, Miller and Phillips contacted an employee of Lakeland Mortgage Company, Barbara Pumphrey, who helped devise a scheme to get the necessary cash. In a nutshell, the plan involved deeding the properties to cooperative straw buyers who would later "sell" the properties, then divided into twelve condominiums, back to Miller and Phillips at an increased cost. The loan proceeds would be used to pay off existing loans with some money left over to renovate the properties.

By the summer of 1987, Wood held title to all the buildings. On July 23, 1987, he deeded Buildings 45 and 51 to Miller's friend and roommate, Brian Ahern, who in turn deeded Building 45 to Miller and Building 51 to Phillips. Both Miller and Phillips obtained mortgages on the properties through Pumphrey, which they used to pay off the original mortgages on the buildings. On December 17, 1987, Wood deeded Building 43 to Ahern. That same day, Phillips deeded Building 51 back to Ahern, and Miller deeded Building 45 to Sherry Mitchell without her knowledge.

Mitchell was associated with Miller's and Phillips' real estate business. She managed the office operations and owned some properties. She was also romantically involved with Phillips. Phillips told Mitchell that she was needed to help with some creative financing. When she asked what she would get out of the deal, Phillips told her that the proceeds of the financing plan would leave $10,000 to be repaid to her from a previous debt.

Miller and Phillips arranged to repurchase the properties from Mitchell and Ahern with mortgages obtained through Pumphrey, who at that point was working at National Mortgage Company. These loans were insured by HUD. In order to qualify for the loans, Miller and Phillips misrepresented their incomes and failed to disclose their full indebtedness. They also falsely represented that they had paid earnest money to the "sellers." Miller forged a HUD Settlement Statement to document a fictitious sale of a house to Frank Jackson, Ahern's employer, which he represented to be the source of his earnest money payment. Miller in fact borrowed $70,000 from Jackson to obtain a cashier's check made out to Ahern which purported to be a down payment on the apartments purchased from Ahern. After a copy of the check was made and submitted to Pumphrey, Ahern endorsed the check and returned it to Miller. Phillips documented the source of his false earnest money payments by forging a promissory note. Additional checks were purchased using Jackson's loan money to show payments from Phillips to Ahern and Mitchell. After the fake earnest payments were documented, Miller repaid Jackson's loan.

In January 1988, Miller and Phillips signed HUD insurance applications prepared by Pumphrey. After the applications were approved, everything was in place to stage the phoney sales. Because of the limited time frame that the mortgage company would hold a mortgage rate and point fees, all twelve condominiums were quickly transferred on January 13, 1988. Both Ahern and Mitchell signed earnest money receipts and HUD settlement statements representing that they had been paid earnest money by Miller or Phillips.

Miller and Phillips obtained mortgage loans totalling $662,920.50. Some proceeds were used to pay off the existing mortgages on the three buildings. On January 15, Miller, Phillips, Ahern and Mitchell met at a bank where Ahern and Mitchell endorsed and cashed checks they had been given at

the closing and handed the cash over to Miller and Phillips. Although there was some conflicting evidence about the exact amount at trial, Phillips paid Mitchell at least $10,000 after the scheme was complete.

Miller and Phillips continued to have financial difficulties. In November 1988, they sold Buildings 43, 45 and 51 to Einar Steffanson. Steffanson failed to make the mortgage payments and ultimately HUD was required to purchase the loans for a total of $814,266.68. After HUD acquired the properties from a successor mortgage company, it sold them at a sheriffs's sale for $156,000.00. All told, then, HUD was out $658,268.68.

## II. DEFENDANTS MILLER AND PHILLIPS

### A. *Increase for Loss*

The presentence report calculated Miller's and Phillips' total offense level to be eighteen, pursuant to the guidelines in effect at the time of their crimes. This included a base offense level of six, § 2F1.1(a); an eight level increase for loss totaling between $500,001–$1,000,000, § 2F1.1(b)(1)(I); a two level increase for more than minimal planning, § 2F1.1(b)(2)(A); a four level enhancement for being organizers or leaders, § 3B1.1(a) and; a two level decrease for acceptance of responsibility, § 3E1.1. The district court adopted the probation officer's calculation with the exception of the increase for loss, which he reduced from eight to six, representing losses between $100,001–$200,000.

Miller and Phillips argue that it was error to enhance their sentences for any losses suffered by HUD because these losses were unintended, unforeseeable and directly caused by intervening actors—the new owner Steffanson, and HUD, which sold the properties at a fraction of their previous value. They note that at the time they obtained the HUD-insured loans the apartments securing the loans were appraised at

$780,000.00. Moreover, the properties were still in good condition when they were sold to Steffanson, who in addition to failing to make the mortgage payments, allowed the apartments to deteriorate. In January, 1990, the tenants were notified that the buildings were threatened with foreclosure, and were later instructed to leave the premises unsecured. HUD, which according to one tenant rejected an offer of approximately $45,000.00 for his apartment, ultimately sold the apartments for $13,000.00 each.

The government's position is that all of HUD's actual losses were properly attributed to the defendants, and, under the guidelines, loss could be measured either by the total amount of the loan proceeds or the net loss to HUD, both yielding an eight level increase. The applicable guidelines provided for an increase for "estimated, probable or intended loss" in excess of $2000.[3] The government contends that the defendants misrepresentations put HUD at risk for at least the full value of the loans. Moreover, the government points to application note 8 which recognized that "gross gain" to a defendant may be a proper measure of loss. *See United States v. Cherif,* 943 F.2d 692, 703 (7th Cir.1991).[4] The district court, apparently agreeing that either figure could be a reasonable estimate of loss, departed downward two levels on the ground that some portion of the loss was not attributable to the defendants.

There is a conflict over whether the amount of loan proceeds may itself be a proper basis to compute loss under the guidelines. *United States v. Brach,* 942 F.2d 141, 143 (2d Cir.1991), holds that the total value of fraudulently obtained loans reflects the "probable loss resulting from the fraud." The court found that a defendant's intention to repay the loans was irrelevant; it was enough that he put the lender at risk for the full amount of the loan. *Cf. United States v. Johnson,* 908 F.2d 396 (8th Cir.1990) (loss from fraudu-

---

**3.** The words "estimated, probable and intended" were deleted effective June 15, 1988.

**4.** The current application note 8 provides in part: "The offender's gain from committing the fraud is an alternative estimate that ordinarily will underestimate loss."

lently obtained bank loans should be measured by the amount of "possible loss" the defendant intended to inflict).

By contrast, the Tenth Circuit, in *United States v. Smith*, 951 F.2d 1164 (10th Cir. 1991), rejected the notion that the ever-present risk of default alone warranted valuing loss at the full amount of the loans. Absent actual loss, the court found that a mere exchange of value—collateral for a loan—could not justify an enhancement for the full value of the loan. *Cf. United States v. Rothberg*, 954 F.2d 217 (4th Cir. 1992) (collateral securing loan must be considered in calculating actual loss). Similarly, the Third Circuit has squarely rejected using the face value of a loan as a basis for calculating loss, finding instead that loss must be measured by the actual loss suffered unless there was a greater probable or intended loss. *United States v. Kopp*, 951 F.2d 521 (3d Cir.1991). *Cf.* Application Note 7(b), 1991 Guidelines.[5]

*Kopp* relied on this court's opinion in *United States v. Schneider*, 930 F.2d 555, 558 (7th Cir.1991). There, a husband and wife made false representations in order to obtain government contracts, which, if awarded, they planned to perform at their bid price. Nor was their ability to perform the work in doubt; they had been awarded numerous government contracts in the past. *Schneider* recognizes a distinction between cases of fraud that deprive a victim of property, and fraud used to obtain a contract that the defendant nonetheless intends to perform:

> One is where the offender—a true con artist—does not intend to perform his undertaking, the contract or whatever; he means to pocket the entire contract price without rendering any service in return. In such a case the contract price is a reasonable estimate of what we are calling expected loss, and we repeat no more than a reasonable estimate is required. The other type of fraud is com-

mitted in order to obtain a contract that the defendant might otherwise not obtain, but he means to perform the contract (and is able to do so) and pocket, as the profit from the fraud, only the difference between the contract price and his costs. This is such a case.

■ We need not, however, determine whether the fraudulent representations in this case are akin to those in *Schneider*. HUD clearly suffered an actual, net loss of $658,268.68; and whether the loss was properly measured by the amount of loan, or the actual loss to HUD, or both, the loss was between $500,001.00 and $1,000,000.00. We reject the defendants' argument that they cannot be held accountable for any losses if these losses were directly caused by others. A victim's failure to mitigate or the negligence of intervening actors does not prevent attributing to the defendants the full of amount of loss. *See United States v. Berkowitz*, 927 F.2d 1376, 1390 (7th Cir.), *cert. denied*, — U.S. ——, 112 S.Ct. 141, 116 L.Ed.2d 108 (1991); *Schneider*, 930 F.2d at 559; *Kopp*, 951 F.2d at 531.

■ That is not to say, however, that the fact that some losses are attributable to causes outside the defendants' control is completely irrelevant. The former application note 11 recognized that there are instances where "the total dollar loss that results from the offense may overstate its seriousness.... In such instances, a downward departure may be warranted." *See also United States v. Carey*, 895 F.2d 318, 322 (7th Cir.1990) (departure may be warranted if due to extrinsic causes beyond defendant's control); *Kopp*, 951 F.2d at 531 (same). The district judge chose to depart downward two levels based on his finding that some losses should not be attributed to the defendants. The government has not appealed this issue, so we do not reach the correctness of the district court's departure. We conclude only that there was a substantial loss for which the district

---

**5.** This note provides in part: "In fraudulent loan application cases and contract procurement cases where the defendant's capabilities are fraudulently represented, the loss is the actual loss to the victim.... For example, if a defendant fraudulently obtains a loan by mis-

representing the value of his assets, the loss is the amount of the loan not repaid at the time the offense is discovered, reduced by the amount the lending institution has recovered, or can expect to recover, from any assets pledged to secure the loan...."

court properly enhanced the defendants' sentence.

## B.   *Increase for Role in Offense*

■ The defendants also dispute the district court's enhancement of their sentences for playing an aggravating role. Section 3B1.1(a) of the guidelines provides for a four level increase "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." Application note 1 defines "participant" as "a person who is criminally responsible for the commission of the offense, but need not have been convicted." The applicability of § 3B1.1 is a question of fact which we review for clear error. *United States v. Herrara*, 878 F.2d 997, 1000 (7th Cir.1989).

The district court found that while there were not at least five participants, the defendants' offense was extensive. The record adequately supports this conclusion. Commission of the fraud required the services of innocent third parties in addition to four criminally responsible individuals. The guidelines recognize that a crime where the principals use "the unknowing services of many outsiders" may be found to be extensive under 3B1.1(a), application note 2. *See also United States v. Boula*, 932 F.2d 651, 654 (7th Cir.1991) ("otherwise extensive" applies to the number of participants in the offense). Miller and Phillips involved Frank Jackson, Christopher Wood, and Brian Ahern, who the district court found lacked guilty knowledge of the scheme. The district court also noted that the scheme involved a loan officer, Kimberly Patterson Curry, who processed the stream of closing documents. *Cf. United States v. Dietz*, 950 F.2d 50 (1st Cir.1991) ("countless" government employees who processed fraudulent documents); *United States v. Allibhai*, 939 F.2d 244 (5th Cir. 1991), *cert. denied*, — U.S. —, 112 S.Ct. 967, 117 L.Ed.2d 133 (1992) (bank employees used in money laundering scheme).

The defendants contend that there are not a sufficient number of persons involved to make the scheme extensive. They point to application note 2's reference to "many" outsiders. But there is no prescribed minimum number of persons needed to permit an enhancement under § 3B1.1. All that is required to find that a scheme is "otherwise extensive" is that the defendant directed at least one criminal participant. *United States v. DeCicco*, 899 F.2d 1531 (7th Cir.1990). The involvement of several other knowing and unknowing individuals was a sufficient ground for the district court to find that the scheme was extensive.

■ Miller and Phillips argue further that while they played "prominent roles" in the scheme, their conduct did not amount to being leaders or organizers. We disagree. The record reveals that they orchestrated the scheme by recruiting the services of both criminally culpable individuals and innocent third parties, and were in direct control of others, particularly Mitchell and Ahern, whom they directed in their roles as phoney sellers. While other participants profited from their involvement in the scheme, Miller and Phillips received the bulk of the loan proceeds. Given these facts, the district court's conclusion that they exercised a leadership role was not clearly erroneous.

## III.   DEFENDANT MITCHELL

### A.   *Ostrich Instruction*

The district court gave the following instruction over Mitchell's objection:

> You may infer knowledge from a combination of suspicion and indifference to the truth. If you find that a person had a strong suspicion that things were not what they seemed or that someone had withheld some important facts, yet shut his or her eyes for fear of what he or she would learn, you may conclude that he or she acted knowingly, as I have used that word.

Mitchell does not challenge the specific language of this instruction, but argues that giving the instruction was improper because there is no evidence that she had a strong suspicion that she was signing false documents or that she deliberately sought to avoid knowledge of the full scope of the

scheme. Instead, Mitchell argues that the evidence at trial showed that she was a mere pawn who acted out of love for Phillips and her complete trust in him.

■ An ostrich instruction is appropriate where a "defendant claims a lack of guilty knowledge and there are facts and evidence that support an inference of deliberate ignorance." *United States v. Talkington*, 875 F.2d 591, 596 (7th Cir.1989). *See also United States v. Ramsey*, 785 F.2d 184, 189 (7th Cir.), *cert. denied*, 476 U.S. 1186, 106 S.Ct. 2924, 91 L.Ed.2d 552 (1986) ("[K]nowledge and deliberate avoidance of knowledge are the same thing."). As this court found in *United States v. Diaz*, 864 F.2d 544, 550 (7th Cir.1988), *cert. denied*, 490 U.S. 1070, 109 S.Ct. 2075, 104 L.Ed.2d 639 (1989):

> The ostrich instruction has been principally employed where there is evidence that the defendant is associated with a group, but where there is also evidence that the defendant consciously was avoiding knowledge of the illegal nature of the group's activity. In most cases, the defendant acknowledges his association with the group but, despite circumstantial knowledge to the contrary, denies knowledge of the group's illegal activity.

■ In reviewing the district court's decision to give an ostrich instruction the evidence must be viewed in the light most favorable to the government. *Talkington*, 875 F.2d at 596. Examined in this light, the record supports the district court's decision to give this instruction. Mitchell denied knowledge that she was involved in an illegal venture, despite several factors which the jury could reasonably infer must have clued her in to the suspect nature of the scheme and therefore provoked some inquiry on her part. Phillips told her that he and Miller were engaged in "creative financing." Real estate was put into her name, with no investment on her part, and she then agreed to pose as a seller and immediately hand over cash to Miller and Phillips. Most telling is that she participated in the scheme after insisting that

from the loan proceeds she be paid money she was owed.

Mitchell asserts that this evidence does not amount to deliberately avoiding knowledge. She notes that there is no evidence that she took affirmative steps to avoid discovering the full scope of the scheme. *Cf. United States v. Kehm*, 799 F.2d 354 (7th Cir.1986) (defendant left meeting to avoid learning about smuggling operation). But we have previously found that "cutting off one's normal curiosity" is avoidance of knowledge sufficient to warrant the inference of deliberate ignorance. *United States v. Giovannetti*, 919 F.2d 1223 (7th Cir.1990). The information Mitchell had was more than enough to prompt further investigation; the whole course of the financing scheme was suspect. The district court's decision to give an ostrich instruction was therefore proper.

B. *Sufficiency of the Evidence*

■ Mitchell also contends that the evidence was insufficient to support her conviction. In order to establish a violation of Section 1010, the government must prove "the making of a false statement in [an] application, knowing it to be false, for the purpose of obtaining a loan from the lending institution and influencing the FHA [HUD]."[6] *United States v. Lovett*, 844 F.2d 487, 489 (7th Cir.1988), (quoting *United States v. Leach*, 427 F.2d 1107 (1st Cir.1970)). Although it is not necessary to demonstrate that the defendant knew that the document was going to be submitted to HUD for insurance, the government must prove that the defendant had knowledge that it would be submitted to HUD for some purpose. *Id.* at 490.

■ Mitchell argues that the government failed to prove that she had the requisite intent, but instead that the evidence showed that she acted in good faith and with complete trust in Phillips. The facts, however, again viewed in the light most favorable to the government, belie this contention. Phillips told Mitchell that she was needed to pose as a seller to help with some

---

6. FHA, the Fair Housing Authority, is a division of HUD.

"creative financing." She endorsed phoney check payments and signed a letter stating that she had been paid earnest money which never had been paid. Moreover, Phillips testified at trial that Mitchell was concerned about how much money she would get after the closing. Circumstantial though the evidence may have been, it was sufficient for a rational juror to infer that Mitchell knowingly made false statements.

There is also ample evidence that Mitchell acted with the intent to defraud HUD. The settlement statements she signed, which falsely represented that earnest money had been paid by the buyer, bore the caption, "**SETTLEMENT STATE-MENT** U.S. DEPARTMENT OF HOUS-ING AND URBAN DEVELOPMENT." Directly above the signature line where Mitchell signed there was the following paragraph:

> I have carefully reviewed the HUD–1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD–1 Settlement Statement.

The final line of the document stated:

> **Warning:** It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

Mitchell also signed documents styled "HUD–1 Certification" and "Addendum I" containing the same certification language and warning. In addition, the "Earnest Money Deposit Receipts" which Mitchell signed also cited the language of Section 1010.

Mitchell contends that her signature on these documents is not proof of criminal intent since there is no evidence that she read what she was signing and plenty of evidence that the closings were rushed, giving no one time to read any documents. But the jury was permitted to infer from Mitchell's signature, coupled with the evidence that she knowingly made false statements, that she intended to defraud HUD. *See United States v. Lee*, 422 F.2d 1049 (5th Cir.1970); *United States v. Barbato*, 471 F.2d 918 (1st Cir.1973); *Cohen v. United States*, 178 F.2d 588 (6th Cir.1949), *cert. denied*, 399 U.S. 920 (1950); *Brilliant v. United States*, 297 F.2d 385 (8th Cir.), *cert. denied*, 369 U.S. 871, 82 S.Ct. 1140, 8 L.Ed.2d 275 (1962). *C.I.T. Corp. v. United States*, 150 F.2d 85 (9th Cir.1945), is not to the contrary. The court there stated that a signature on a document containing false statements was not sufficient by itself to show intent to defraud the government. But in that case there was no evidence that the defendant was aware that the representations in the documents were false. Here, there is an abundance of circumstantial evidence, in addition to the numerous references to HUD on the documents she signed, that Mitchell knowingly made false representations. This evidence, coupled with her signature on the HUD forms, was a reasonable basis for the jury to infer that Mitchell intended to influence HUD.

Based on the foregoing, the district court is AFFIRMED.

FLAUM, Circuit Judge, concurring.

I concur in all of Judge Will's fine opinion, and write separately only to present some additional thoughts on our discussion in section II.A, where we upheld the district court's six-level increase in Miller's sentence under § 2F1.1(b)(1) for causing a loss of between $100,001–$200,000.

As an initial matter, it is worth noting that in this case we need not choose sides between *United States v. Smith*, 951 F.2d 1164 (10th Cir.1991), and *United States v. Kopp*, 951 F.2d 521 (3d Cir.1991), on the one hand, and *United States v. Brach*, 942 F.2d 141 (2d Cir.1991), on the other. *Brach* held that the loan proceeds fraudulently obtained by a defendant accurately measures the amount of loss under § 2F1.1(b)(1). *Brach*, 942 F.2d at 143. *Smith* and *Kopp* rejected that approach, holding that the amount of loss must reflect the actual economic loss to the de-

frauded party, and therefore must take into account the value of the collateral recovered by that party. *Smith*, 951 F.2d at 1167; *Kopp*, 951 F.2d at 536. Here, Miller obtained loan proceeds of approximately $663,000, while the actual economic loss to the government (loan proceeds minus costs recovered at liquidation, plus interest) was approximately $658,000. The district court relied upon both figures in setting the government's net loss at between $500,000 and $1,000,000. *See* III Tr. at 49. Accordingly, even if we accepted the approach established in *Smith* and *Kopp* and held that the district court should not have relied upon the $663,000 figure, the error would have been harmless and remand unnecessary; there is no difference in sentencing for a $658,000 loss and a $663,000 loss. *Williams v. United States*, — U.S. —, 112 S.Ct. 1112, 1120 (1992) (remand unnecessary if "the district court would have imposed the same sentence had it not relied upon the invalid factor or factors").

All the same, were we forced to confront the issue, I would side with *Smith* and *Kopp* and against *Brach*. *Brach*'s holding that the loan proceeds reflect the "probable loss resulting from the fraud," 942 F.2d at 143, I respectfully suggest, cannot be right. When the government puts its cash at risk in exchange for the right to a borrower's collateral—which it does, in effect, by guaranteeing a loan—it suffers no net loss, assuming, of course, that the collateral is sufficient to cover any default. This assumption will, in most instances, hold so long as the borrower does not misrepresent the value of his collateral. Accordingly, *Brach*'s ruling that the total loan proceeds accurately measure loss under § 2F1.1(b) bears little, if any, "relation to economic reality," *United States v. Schneider*, 930 F.2d 555, 559 (7th Cir.1991), and hence suffers in comparison to *Smith* and *Kopp*. Application Note 7(b), adopted after this case was briefed and far after the district court rendered its decision, demonstrates that *Smith* and *Kopp* better reflect the view of the Guidelines drafters:

> if a defendant fraudulently obtains a loan by misrepresenting the value of his assets, the loss is the amount of the loan not repaid at the time the offense is discovered, reduced by the amount the lending institution has recovered, or can expect to recover, from any assets pledged to secure the loan.

As such, I would suggest that, in future cases, we treat the net loss to the victim, not the face value of the loan, as the starting point for determining loss under § 2F1.1(b). In this case, the government's net loss was $658,000.

The Guidelines also recognize that the actual net loss may either overstate or understate the seriousness of an offense, and that in those circumstances a district court may depart upward or downward. *See, e.g.,* § 2F1.1(b), Application Note 7(b) (upward departure permitted where collateral fully covered loan—meaning that net loss was zero—if defendant's conduct created a risk of loss); *id.* (downward departure permitted if unforseen event would have caused a default even absent defendant's minor fraud); *id.,* Application Note 10 (listing other grounds for departure); *Kopp,* 951 F.2d at 536 (upward departure permitted if defendant intended to inflict greater net loss than that which occurred). Here, the district court departed downward, having determined that Miller was not responsible for HUD's total loss, but only for between $100,001–$200,000 of it.

Against this backdrop, one can see why we must reject Miller's appeal of his sentence. Miller maintains that the amount of loss under § 2F1.1(b)(1) should be measured as of the time he sold the properties to Einar Steffanson. At that point, Miller argues, the properties were worth more than the outstanding indebtedness of the loan; they lost their value due to intervening circumstances—namely Steffanson's neglect, and HUD's alleged negligence in managing the properties (once it took title from Steffanson) and failure to get top dollar upon liquidation. Consequently, Miller claims that the amount of loss *due to his fraud* was zero. As noted, however, § 2F1.1(b)(1) loss is measured by the net loss to the injured party, which, in this case, is $658,000. What Miller seeks (and received), then, is properly characterized as

a downward departure based upon the fact that Steffanson and HUD, rather than he, were responsible for some of the loss. *See Kopp,* 951 F.2d at 531 (distinguishing "calculation of 'loss' in the first instance" from discretionary downward departures when net loss not attributable entirely to defendant's fraud). The district court believed that Miller was responsible for only part of HUD's losses, and hence deserved a departure, a ruling upon which Judge Will's lead opinion does not pass owing to the government's decision not to appeal.