**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Richard S. HOLIUSA, Defendant–**
**Appellant.**

**No. 92–3989.**

United States Court of Appeals,
Seventh Circuit.

Submitted June 1, 1993.

Decided Jan. 5, 1994.

Andrew B. Baker, Jr., Asst. U.S. Atty., Dyer, IN, for U.S.

Nathaniel Ruff, Lesniak & Ruff, East Chicago, IN, for defendant-appellant.

Before BAUER, MANION and ROVNER, Circuit Judges.

ILANA DIAMOND ROVNER, Circuit Judge.

This appeal raises the question of how "loss" should be calculated under Sentencing Guidelines section 2F1.1 in cases involving a "Ponzi" or pyramid scheme, when defendants have partially repaid fraudulently-obtained funds before detection of the scheme.

## I.

Between January 1982 and April 1988, Richard Holiusa and his co-conspirators solicited investments in various companies, representing that they would reinvest the money in silver futures and high-yield government securities. They promised investors that their principal would not be at risk and that they would realize high rates of return. In fact, the funds were used to cover the operating expenses of the various companies and were never reinvested. The conspirators sent investors fraudulent weekly and monthly statements detailing both the principal investment and the interest that had purportedly accrued. They perpetuated the scheme by paying off earlier investors with the money of new investors. Thus, although

a total of $11,625,739 was invested in the fraudulent operation, slightly more than $8,000,000 was returned to investors before the scheme was discovered.

After being charged in a ten-count indictment, Holiusa pled guilty to mail fraud, conspiracy to commit mail fraud, and failure to report a currency transaction. He received a pre-Guidelines sentence of five years on the mail fraud count, and was sentenced under Sentencing Guidelines section 2F1.1 on the remaining two counts. That guideline, which applies to offenses involving fraud, provides for a base offense level of 6, which is to be increased depending on the amount of "loss." Finding the loss in this case to be the full $11,625,739, the district court increased Holiusa's sentence by eleven levels pursuant to section 2F1.1(b)(1)(L).[1] After making various other adjustments, the court arrived at a total offense level of 23. In conjunction with criminal history category I, that offense level produced a sentencing range of 46–57 months. The district court sentenced Holiusa at the very top of the range to 57 months, to be followed by the 5 year pre-Guidelines sentence and three years of supervised release.

On appeal, Holiusa contests the district court's calculation to the extent that it was based on a loss amount of $11,625,739. He argues that because over $8,000,000 was returned to investors, the actual loss was approximately $3,500,000.[2] The government contends that the full amount should be considered, even though much of it was returned, because the money was not reinvested as investors had been promised. The district court agreed with that rationale:

In this case the gravity of the completed crime was more substantial than the ultimate loss suffered by the victims. This Court finds in this case that the defendant never intended to invest the monies taken from the victims; that the intent of this defendant was to defraud all of the victims of their money.

Pursuant to the exhibits and the testimony, this court now finds that the amount of intended or probable loss would be ... $11,625,739.

(Nov. 23, 1992 Tr. at 164–65).

■ Although the district court's loss calculation is a factual finding that we review for clear error, the meaning of "loss" for purposes of section 2F1.1 is a question of law that is subject to de novo review. *United States v. Chevalier*, 1 F.3d 581, 585 (7th Cir.1993); *United States v. Strozier*, 981 F.2d 281, 283 (7th Cir.1992).

## II.

■ Section 2F1.1 takes into account more than actual losses. Application Note 7 to the section explains:[3]

In keeping with the Commission's policy on attempts, if a probable or intended loss that the defendant was attempting to inflict can be determined, that figure would be used if it was larger than the actual loss.

*See also United States v. Schneider*, 930 F.2d 555, 556 (7th Cir.1991). In addition to actual loss, then, we must consider the loss that was "probable or intended." Although "intended" is straightforward enough, "probable," which was deleted from the note in 1991 (*see* n. 3), is unclear and might·be understood to greatly expand the loss inquiry. The term's meaning is limited, however, by "attempt," with which it is twice linked ("In keeping with the Commission's policy on *attempts*, if a probable ... loss that the defendant was

---

**1.** A November 1, 1989 amendment to section 2F1.1 changed the offense levels associated with various amounts of loss. Holiusa was sentenced under the pre–1989 version. We also rely on that version because, although Holiusa was sentenced in 1992, application of the newer version would result in a harsher sentence and thus pose ex post facto problems. *See United States v. Harris*, 994 F.2d 412, 416 n. 9 (7th Cir.1993).

**2.** That amount would have produced a ten-level increase under section 2F1.1(b)(1)(K), which would have resulted in a total offense level of 22 and a sentencing range of 41–51 months.

**3.** Application Note 7 was amended effective November 1991. It now reads:

Consistent with the provisions of § 2X1.1 (Attempt, Solicitation or Conspiracy), if an intended loss that the defendant was attempting to inflict can ,be determined, this figure will be used if it is greater than the actual loss.

*attempting* to inflict ...). Thus, as the Third Circuit has explained, "[t]he fraud guideline ... has never endorsed sentencing based on the worst-case scenario potential loss." *United States v. Kopp*, 951 F.2d 521, 529 (3d Cir.1991) (emphasis in original). That reading is supported by the fact that when the Commission deleted "probable" in 1991, it did not intend to substantively change the note, but only to "conform[ ] the wording of Application Note 7 of the Commentary to § 2F1.1 to Application Note 2 of the Commentary of § 2B1.1 to make clear that the treatment of attempts in cases of fraud and theft is identical." U.S.S.G. Appendix C, Amendment 393. *See also Kopp*, 951 F.2d at 529; *United States v. Bailey*, 975 F.2d 1028, 1031 (4th Cir.1992).

 In addition, the note directs us to consider the "intended or probable loss that the defendant was attempting to inflict" only if it is greater than the actual loss. Thus, if the defendant intends to take a greater amount than he succeeds in taking before detection of the scheme, he is sentenced for the larger amount. In *Strozier*, 981 F.2d at 283–85, for example, the defendant had deposited $405,000 worth of bad checks into his bank account, but had withdrawn only $36,-000 before his arrest. We found that a sentence based on the full amount was appropriate because the evidence clearly indicated that Strozier would have withdrawn that amount if his scheme had not been detected.

 At the same time, unrealized plans to repay do not reduce the loss amount. If the defendant intended to return the money but did not, then the actual loss is greater than the intended loss and the intended loss becomes irrelevant. As we explained in *United States v. Mount*, 966 F.2d 262, 266 (7th Cir.1992):

> An embezzler who abstracts $10,000 to invest in the stock market causes a "loss" of $10,000 even if he plans to repay before

the next audit (to avoid detection) and even if he invests only in blue chip stocks.

 \* \* \* \* \* \*

> The embezzler causes loss in the full amount taken, despite plans to repay, because the employer is at risk in the interim and lacks a ready source of recompense.

 In contrast to those situations, however, the full amount involved is not considered if the defendant both intended to and did return part of that amount before detection of his scheme. As *Mount* further elucidated:

> Both the Sentencing Commission's notes defining "loss", see § 2B1.1 (commentary) and § 2F1.1, application note 7, and this court's cases, e.g., *United States v. Schneider*, 930 F.2d 555 (7th Cir.1991), call for the court to determine the net detriment to the victim rather than the gross amount of money that changes hands. So a fraud that consists in promising 20 ounces of gold but delivering only 10 produces as loss the value of 10 ounces of gold, not 20. Borrowing $20,000 by fraud and pledging $10,000 in stock as security produces a "loss" of $10,000: "the loss is the amount of the loan not repaid at the time the offense is discovered, reduced by the amount the lending institution has recovered, or can expect to recover, from any assets pledged to secure the loan." Guideline 2F1.1, application note 7(b).

 \* \* \* \* \* \*

> The difference between gross and net loss matters if the offender has paid in part before detection, or the victim has access to a ready source of compensation such as the assets securing the fraudulently-obtained loan.

*966 F.2d at 265–66.*[4]

Such is the case here. The full amount invested was not the probable or intended loss because Holiusa did not at any point intend to keep the entire sum. Indeed, return of the money—that is payment of earlier investors with the funds of later inves-

---

4. Contrary to the dissent's characterization, *Mount* is distinguishable from this case because it involved an *unrealized* intention to repay. The language from *Mount* quoted above makes clear that *Mount* did not contemplate that the full

amount be considered when repayment had been accomplished. Nor does *Mount* limit itself to cases involving security that has been pledged to secure fraudulent loans.

tors—was an integral aspect of Holiusa's scheme, essential to its continuation. And, in line with his intentions, Holiusa returned over $8 million to investors before the scheme was detected. Because he did not intend to and did not keep the full $11.6 million, that amount does not reflect the actual or intended loss, and is not an appropriate basis for sentencing.

The government argues that the full amount should be considered even if all or part of it was returned before discovery of the scheme because the invested funds were "at risk" in the interim. The government cites fraudulent loan cases that have considered as loss the full value of the loan even though the bank was able to recover some of that amount. *See United States v. Brach*, 942 F.2d 141, 143 (2d Cir.1991) (suggesting in dicta that defendant would be liable for full amount of loan even if he had repaid it before fraud was discovered); *United States v. Johnson*, 908 F.2d 396, 398 (8th Cir.1990).[5] The government also points to our own language in *Schneider* as supporting its position:

> [T]he fact that the victims might have been able to recover some of the money taken from them by enforcing their security interests no more reduced the victims' loss in the contemplation of the law than if a pickpocket got cold feet and returned his victim's wallet before the victim discovered it had been missing. The crime is complete when the thief obtains the victim's property.... What happens later is irrelevant.

930 F.2d at 559.

Notwithstanding that language, however, *Schneider*'s ultimate holding—that defen-

dants should not be sentenced based on the full value of a fraudulently-obtained contract when they intended to perform the contract—supports the net loss approach.[6] Moreover, the Sentencing Commission has since rejected the full value approach. In its November 1991 amendment, it added Application Note 7(b), which provides:

> [I]f a defendant fraudulently obtains a loan by misrepresenting the value of his assets, the loss is the amount of the loan not repaid at the time the offense is discovered, reduced by the amount the lending institution has recovered, or can expect to recover, from any assets pledged to secure the loan.

Although the post-sentencing amendment is not binding here, the fact that the Sentencing Commission did not intend the 1991 amendments to substantively change the guideline suggests that this approach is also proper in pre–1991 cases. *See United States v. Menichino*, 989 F.2d 438, 441–42 (11th Cir.1993) (per curiam); *United States v. Smith*, 951 F.2d 1164, 1168 (10th Cir.1991); *Kopp*, 951 F.2d at 534–35. The above-quoted portion of *Mount* has also since adopted the net loss approach, without suggesting that its analysis was limited to any particular Guidelines version. In his concurring opinion in *United States v. Miller*, 962 F.2d 739, 747–49 (7th Cir.1992), a case that addressed but did not decide this issue, Judge Flaum also indicated his support for considering only net losses. *See also Chevalier*, 1 F.3d at 586–87. The same approach has been adopted by the Third Circuit in its extremely well-reasoned opinion in *Kopp*, 951 F.2d at 527–36, by the Tenth Circuit in *Smith*, 951 at 1167–68, and

---

5. *See also United States v. Prendergast*, 979 F.2d 1289, 1292 & n. 1 (8th Cir.1992) (collecting cases); *United States v. Galliano*, 977 F.2d 1350, 1353 (9th Cir.1992), *cert. denied*, — U.S. —, 113 S.Ct. 1399, 122 L.Ed.2d 772 (1993).

6. The government also contends that the following *Schneider* language supports its position:
> [J]ust as it is embezzlement if an employee takes money from his employer and replaces it before it is missed, so it is fraud to impose an enormous risk of loss on one's employer through deliberate misrepresentation even when the risk does not materialize.

930 F.2d at 558 (quoting *United States v. Dial*, 757 F.2d 163, 170 (7th Cir.), *cert. denied*, 474 U.S. 838, 106 S.Ct. 116, 88 L.Ed.2d 95 (1985)). To any extent that that language might be relevant here, however, the government's suggested reading has already been implicitly rejected by *Mount*, which cited *Schneider* in support of the position we now adopt. As we explained in *Strozier*, "*Mount*'s citation to *Schneider* in its discussion of loss calculations under § 2F1.1 demonstrates that it is in harmony with the approach presented in [*Schneider*]." 981 F.2d at 284 n. 6.

by the Eleventh Circuit in *Menichino,* 989 F.2d at 441–42.[7]

### III.

Holiusa should not have been sentenced based on amounts that he both intended to and indeed did return to investors. We vacate his sentence and remand for resentencing.

MANION, Circuit Judge, dissenting.

During a period of over six years, Richard Holiusa enticed "investors" to give him a total of over $11 million, supposedly so he could invest their money in silver futures and high-yield government securities. Instead, he lived high on the hog. He perpetuated his lavish lifestyle by placating earlier investors with periodic payments of money he collected from more recent victims of his scheme. When his six-year odyssey ended, he apparently had spent only $3.5 million on himself; the rest he returned to his victims, keeping them at bay.

This case involves a straightforward application of "loss" under U.S.S.G. § 2F1.1. The district court found that at the time Holiusa solicited funds from the investors, "he never intended to invest the money taken from the victims," and "that the intent of this defendant was to defraud all the victims of their money." At 1045 (quoting Tr. at 164–65). Given this finding—which we are not free to disregard unless clearly erroneous, *see U.S.A. v. Boyle,* 10 F.3d 485, 490 (7th Cir. 1993)—Holiusa has caused a "loss" under § 2F1.1 for the full amount of the money as soon as he took it from his victims. How he planned to use the money is irrelevant under the Guidelines because each time he took money from investors, he put their money "at risk" and left them without a "ready source of recompense." *See United States v. Mount,* 966 F.2d 262, 266 (7th Cir.1992).

True, Holiusa did redistribute $8.6 million to many of his victims before his scheme fell apart; but in line with the district court's finding, the money was stolen the day he received it from his victims. Instead of corralling money from a few investors, then skipping town, Holiusa extended his scheme by giving back some money and taking in more. But all the while the money was totally "at risk." He literally robbed Peter to pay Paul (whom he had defrauded earlier). As the district court found, in this case, robbing someone like Paul created the loss; using Peter's money to temporarily buy off Paul did not eradicate the fact that Paul was robbed in the first place. "An embezzler who abstracts $10,000 to invest in the stock market causes a 'loss' of $10,000 even if he plans to repay before the next audit (to avoid detection) and even if he invests only in blue chip stocks." *Mount,* 966 F.2d at 266. Therefore, for purposes of enhancement under § 2F1.1, the loss was the full $11.6 million, the total amount wrongfully taken from each investor and which had been put at risk when first taken.

The court compares the return of some of the fraudulently taken funds to the giving of a security or pledge of an asset. But a pledged asset is presumably not stolen property. If it were, it would not be treated as an offset; instead, it would be treated as part of a loss. The only "security" these investors had was Holiusa's need to periodically transfer some money back in order to con the investors into thinking they were getting a good return on their money. In fact, the only "return" was money he defrauded from someone else. The investors held no independent asset as security while Holiusa maneuvered their money around. This process of partial return was an essential part of Holiusa's "Ponzi" scheme,[1] and any compari-

---

7. Although this case may arguably involve a greater risk than loan or contract cases, we hesitate to draw distinctions based on degree of risk. The guideline offers no support for such an approach, which would seem fraught with potential problems.

1. This scheme derives its name from the notorious swindler, Charles Ponzi, who, starting in 1919, received $9,582,000 within a period of eight months by inducing investors to give him $100 for the promised repayment of $150. *See United States v. Boula,* 932 F.2d 651, 652 n. 1 (7th Cir.1991). *See also, Bosco v. Serhant,* 836 F.2d 271, 274 (7th Cir.1987) (Noting that the modus operandi of a Ponzi scheme is to use newly invested money to pay off old investors and convince them that they are "earning profits rather than losing their shirts.").

son to a legitimate pledge or security is unfounded.

This case is no different than a series of thefts or embezzlements. Just as an embezzler causes loss under § 2F1.1 for the full amount taken, irrespective of his intention to repay, *see Mount*, 966 F.2d at 266, here too, each time Holiusa obtained money from an investor he caused an immediate loss for the full amount he took because he left each investor at risk without a ready source of recompense. Therefore, I would affirm the district court's determination that the loss in this case was the full $11,625,739.00, the amount Holiusa fraudulently took from his victims in the first place.