**UNITED STATES of America, Plaintiff–Appellee,**

**v.**

**Jim JOHNSON, Defendant–Appellant.**

No. 92–3085.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 5, 1993.

Decided Feb. 7, 1994.

**168**

Barry R. Elden and Matthew M. Schneider (argued), Asst. U.S. Attys., Office of the U.S. Atty., Criminal Receiving, Appellate Div., Chicago, IL, for plaintiff-appellee.

Carl P. Clavelli (argued), Chicago, IL, for defendant-appellant.

Before COFFEY, FLAUM, and KANNE, Circuit Judges.

KANNE, Circuit Judge.

This case presents the question of how "intended or probable loss" should be calculated under Sentencing Guideline Section 2F1.1(b)(1) in a case of a fraudulently obtained loan.

Jim Johnson was convicted of making false statements to a financial institution in order to obtain $52,000 in loans in violation of 18 U.S.C. § 1344 and of using a false social security number for purposes of obtaining a loan in violation of 42 U.S.C. § 408(g). Because the fraud was discovered before the loan proceeds were disbursed the financial institution incurred no actual loss. However, the district court found that Johnson intended to defraud the bank for the full amount of the loan and sentenced him accordingly. Johnson appeals, arguing that the court erred in calculating the amount of "loss" attributable to the fraudulent conduct.

## I. BACKGROUND

In negotiating the purchase of a 1986 Porsche 928 from Mathieu Imports for $39,651, Johnson gave the dealership a check drawn on his business account at the Heritage–Olympia Bank, which he was aware had been closed three days earlier.[1] In return, the dealership gave Johnson a purchase order marked "paid in full" and agreed to hold the check in order to allow Johnson to arrange for his own financing.

Johnson then met with Jeanne Reynolds, vice president in charge of commercial banking at the American National Bank of Lansing, Illinois (ANB). He told Reynolds that he needed a loan for working capital for a restaurant he owned named the "Rib Factory." The application process required from Johnson a personal financial statement and three years of federal income tax returns. On the basis of the social security number Johnson submitted—a number different than the one issued to him by the Department of Health and Human Services—he received a favorable credit report. An analysis of his financial statement and tax returns also reflected a substantial net worth and a solid history of earnings. When the bank requested other collateral to secure the loan, for it was the policy of the ANB not to loan money against inventory, Johnson offered the purchase order for the Porsche and claimed that he owned it. After learning from the dealership that title to the Porsche was still in its name, Reynolds agreed to authorize a loan department check in the amount of $29,600 or eighty percent of the purchase price but made it payable to the order of Johnson and Mathieu Imports. This was to ensure that a "first lien" in favor of the Bank would be recorded on the title to the Porsche. While negotiating the "working capital" loan, Johnson also inquired about a car loan in order to obtain a vehicle for business use. Johnson returned to Mathieu Imports that day and selected a new Audi station wagon. Later that same day, Reynolds agreed to authorize a loan for eighty percent of the purchase price of the Audi. A second bank draft was issued for $23,296 also payable to Johnson and Mathieu Imports and carrying the restriction that the ANB be recorded as a first lienholder. Johnson presented both loan checks to the car dealership, as well as a third check for $12,505 drawn on a commercial account with the ANB.

---

1. Heritage–Olympia had closed Johnson's account, because he had written fourteen checks totaling nearly $9,000 without sufficient funds.

Shortly thereafter, Reynolds learned that the Lincolnway Currency Exchange had inquired whether the check for $29,600 to Johnson was good. At Reynolds' request, the currency exchange operator faxed a copy of the check to the ANB. The fax transmission reflected only Johnson's name on the payee line, causing Reynolds to believe that Johnson had altered the check and attempted to negotiate it. Tr. 72–75, 99–100. When confronted, Johnson denied the allegation.[2] On the same day, Johnson's check for $12,505 was rejected due to insufficient funds in his commercial account. Upon realizing that the commercial check together with the two loan checks equaled the total purchase price of the two vehicles, Reynolds suspected that the $29,600 loan was not being used for working capital as represented and placed a stop payment order on both loan checks. Subsequently, Mathieu Imports repossessed the Porsche and the Audi.

A federal grand jury returned a two-count indictment against Johnson, charging him under 18 U.S.C. § 1344 with executing a scheme to defraud the ANB and with using a false social security number for the purpose of obtaining a loan in violation of 42 U.S.C. § 408(g).

Johnson proceeded to trial before a jury and was found guilty as charged. A presentence investigation and report was prepared. The district court adopted the probation officer's sentence calculation which set Johnson's base offense level at six pursuant to § 2F1.1(a) of the United States Sentencing Guidelines. After finding that the offense involved a "loss" of more than $40,000 but less than $70,000, the sentencing judge added five points, see § 2F1.1(b)(1)(F), and added two more upon concluding that the offense required more than minimal planning, § 2F1.1(b)(2). A two-point reduction for ac-

ceptance of responsibility was denied as was the government's motion for an upward departure on the ground that Johnson's criminal history category failed to adequately reflect the seriousness of his past criminal conduct.[3] Johnson's adjusted offense level of 13, combined with a criminal history category of five, yielded a sentencing range of 30–37 months. The court sentenced Johnson at the lowest end of the range on both counts, resulting in a concurrent 30 month term of imprisonment, to be followed by five years of supervised release.

Johnson argues that the district court's calculation of the amount of "probable or intended loss" under § 2F1.1 at $52,000—the face value of the two loan checks—without any offset for pledged collateral was improper. Johnson's calculation would reduce the loss figure by the value of the collateral pledged to secure the loans, i.e., the Porsche and the Audi. Because the loans were calculated at eighty percent of the value of the vehicles, subtracting the value of the collateral from the loan amount would have resulted in zero loss. A loss determination equal to the net difference between the full value of the loan and the value of the collateral securing the loan, Johnson argues, bears a closer relation to economic reality in a case, such as this, of fraud in the inducement.

Relying on the commentary to Guideline § 2F1.1, the district court concluded that although the bank never honored the loan checks and therefore never experienced any loss, "it is not the actual amount lost by American National Bank but the amount the defendant intended to defraud from the bank that will be used when applying Guideline 2F1.1(b)." Sent. Tr. 20–22; see "Statement of Reasons for Imposing Sentence under the Sentencing Guidelines" 7–8 Aug. 26, 1992 (citing § 2F1.1 comment n. 7). At issue,

---

**2.** Testimony from the currency exchange operator appears to support Johnson's position that he had not attempted to negotiate the check but had presented it only to demonstrate that he had financing for his restaurant located across the street. Tr. 219–223. Even this, however, was sufficient cause for alarm for it suggested yet another attempt to misrepresent his financial status.

**3.** In addition to two judgments against Johnson for defaulting on motor vehicle loans, the government presented evidence of other instances where Johnson submitted false information to obtain residential leases, submitted false social security numbers on a number of court pleadings, and supplied false information when opening various checking accounts. The court, however, found these instances of uncharged alleged criminal conduct not sufficiently reliable to warrant a departure under U.S.S.G. § 4A1.1(a).

then, is whether the full amount of the loan proceeds is a proper measure of the probable or intended loss that would have been inflicted had the fraudulent scheme not been interrupted.

## II. DISCUSSION

■ Our review of a district court's sentencing decision is deferential. The district court's assessment of the amount of loss is a factual finding, which we will not disturb unless it is clearly erroneous. *United States v. Strozier,* 981 F.2d 281, 283 (7th Cir.1992); *United States v. Haddon,* 927 F.2d 942, 952 (7th Cir.1991). The meaning of "loss," however, is a legal question on which our review is plenary. *Strozier,* 981 F.2d at 283; *United States v. Mount,* 966 F.2d 262, 265 (7th Cir.1992).

■ "Loss" as the term is used in the Guidelines has been defined as the greater of the value of the property "taken, damaged, or destroyed," *i.e.,* the actual loss, (cross reference to § 2B1.1), or the property the defendant intended to take. U.S.S.G. § 2F1.1, comment n. 7 (Nov. 1, 1991); *see United States v. Menichino,* 989 F.2d 438, 441 (11th Cir.1993). When calculating loss, Guideline § 2F1.1 directs the district court to increase a defendant's offense level based on the greater value between the actual loss suffered and the intended or probable loss which the defendant attempted to inflict. *See* § 2F1.1, comment n. 7. In fraudulent loan application cases, specific guidance provides that "if a defendant fraudulently obtains a loan by misrepresenting the value of his assets, the loss is the amount of the loan not repaid at the time the offense is discovered, reduced by the amount the lending institution has recovered, or can expect to recover, from any assets pledged to secure the loan." [4] § 2F1.1 comment n. 7(b); *see also*

*Mount,* 966 F.2d at 265. Consistent with this directive, the district court should begin by determining the victim's actual loss and then separately determine whether the defendant "intended" or "expected" to inflict a loss greater than the actual loss. *Mount,* 966 F.2d at 265–66; *United States v. Miller,* 962 F.2d 739, 748 (7th Cir.1992) (Flaum, J. concurring). If the intended loss is both ascertainable and higher than the actual loss, it should be used in calculating the sentence. *See Miller,* 962 F.2d at 748; *United States v. Shaw,* 3 F.3d 311, 313 (9th Cir.1993); *United States v. Kopp,* 951 F.2d 521, 529 (3d Cir. 1991). Furthermore, in *United States v. Schneider,* 930 F.2d 555, 556 (7th Cir.1991) we have made clear that "in the case of fraud, the loss need not be actual; it is enough if it is probable or intended." *See also Strozier,* 981 F.2d at 284. This is applicable particularly where there is no actual loss such as when the fraud is discovered or otherwise interrupted before the victim has been swindled. *Id.; Mount,* 966 F.2d at 266 (although purchase of fraudulently obtained tickets for the league playoffs and the World Series from an individual cooperating with the government resulted in no actual loss, loss properly valued at the difference between the face value and the market value, which was an element of value to the team).

■ If the fraud is akin to theft—where the defendant does not intend to perform as agreed—the net and gross loss are the same because the victim received nothing of value in return for property given. *Schneider,* 930 F.2d at 558. When dealing with this type of fraud, even if the victim suffered no loss or was able to recoup some of the loss, the Guidelines direct that the intended or probable loss which the defendant was "attempting to inflict" should be considered if it is greater

4. Application Note 7(b) has been amended to include the language: "However, where the intended loss is greater than the actual loss, the intended loss is to be used." This amendment, effective November 1, 1992, was meant to clarify that in cases involving fraud, including fraudulent loan application cases, "if the intended loss is greater than the actual loss, the intended loss is used." U.S.S.G. Appendix C, Amendment 470. Because this amendment is a clarification as opposed to a substantive change to the earlier version in effect at the time of Johnson's sentencing, it may be considered as support for using the total amount of a fraudulently obtained loan as the intended loss even when no actual loss occurred. *See United States v. Cedano–Rojas,* 999 F.2d 1175, 1182 (7th Cir.1993) (court may consider amendment to the Guidelines on direct appeal as long as the amendment clarifies, but does not substantively change the applicable provision).

than the actual loss. § 2F1.1, comment n. 7. Thus, for sentencing purposes the loss may still be calculated at what the loss would have been had the fraud been realized, *i.e.,* the intended or probable loss. *See, e.g., Strozier,* 981 F.2d at 283–85 (intended loss calculated at total amount of nonsufficient fund checks deposited by defendant even though at the time the fraud was detected he had only withdrawn a portion of the total).

▪ Other fraud consists of an unequal exchange of property where the defendant misrepresents the value of the consideration advanced in order to obtain a loan or contract that but for the fraudulent representations might not otherwise have been obtained but where the defendant fully intends to perform and is capable of performing. *Schneider,* 930 F.2d at 558. When some value has been transferred to the victim, we have called for a determination of the net detriment to the victim, or put another way, we measure loss by the difference in value exchanged rather than simply by the face value of the loan or by the gross amount of money that changes hands. *Mount,* 966 F.2d at 265; *see United States v. Holiusa,* 13 F.3d 1043, 1046–48 (7th Cir.1994); *see also Schneider,* 930 F.2d at 559; *Miller,* 962 F.2d at 748 (Flaum, J. concurring).

We recently declined an opportunity, however, to determine in a fraudulently obtained loan case whether loss may be properly measured by the full amount of the loan. In *United States v. Miller,* 962 F.2d 739, 743–44 (7th Cir.1992), the actual net loss occasioned by the defendants' scheme to defraud the department of Housing and Urban Development and the loan amount fraudulently obtained were both within the same range of loss carrying an eight level sentencing increase. Because it mattered not which figure the district court relied on any error in relying on the face value of the loan would have been harmless. The distinction between actual and probable or intended loss had no practical effect in *Miller.* But in

other cases the qualification may be important because it allows punishment to be meted out according to the degree of harm to the victim and the gain to the defendant. *Schneider,* 930 F.2d at 559; *United States v. Khan,* 969 F.2d 218, 220 (6th Cir.1992).

In cases where a loan is procured through fraud, there appears to be some conflict over whether the defendant's subjective intent to repay should be considered or whether the "intended or probable loss" simply should be determined to be the gross amount of the loan. The Second Circuit holds that the focus for sentencing purposes should be on the amount of possible loss the defendant attempted to inflict on the victim, which in the context of a fraudulently obtained loan is the total value of the loan proceeds. *United States v. Brach,* 942 F.2d 141, 143 (2d Cir. 1991). Under this view, the actual loss suffered is irrelevant; it is enough that the defendant put the lender at risk for the full amount and the subjective intent to repay the loan is largely immaterial. Criticism of this approach charges that it equates "possible" loss (the full amount put at risk) with "probable or intended" loss—a result not likely contemplated by the Guidelines.[5] *See Shaw,* 3 F.3d at 313; *Kopp,* 951 F.2d at 533. Our case law supports this distinction.

▪ Consistent with the Guidelines, we have concluded that the loss calculation should be the greater of the amount the victim actually lost, calculated by the net detriment to the victim—estimated at the time of sentencing—not the potential loss as measured at the time of the crime—and the amount that the defendant intended to inflict on the victim, or the amount of probable loss, if either loss is estimable and higher than the actual loss. *United States v. Chevalier,* 1 F.3d 581, 585 (7th Cir.1993); *see Strozier,* 981 F.2d at 284; *Mount,* 966 F.2d at 265; *Schneider,* 930 F.2d at 559. Thus only if it can be established that the defendant attempted to take a larger sum than he actual-

---

5. This position is supported by the 1991 amendment to § 2F1.1 which deleted the word "probable" from Application Note 7 in an effort to conform the language to Application Note 2 of § 2B1.1 (concerning valuation of loss in cases of larceny, embezzlement, and other forms of theft). This change was intended to "make clear that the treatment of attempts in cases of fraud and theft is identical." U.S.S.G. Appendix C, amendment 393; *United States v. Holiusa,* 13 F.3d 1043, 1045 (7th Cir.1994).

ly managed will he be sentenced for the greater loss. *Holiusa,* 13 F.3d at 1045 (citing *Strozier,* 981 F.2d at 283–85). As the Guidelines only contemplate an increase for an intended loss *greater* than the actual, it follows that the defendant's subjective but unrealized intention to repay will not be considered to reduce the loss amount.[6] *Holiusa,* 13 F.3d at 1046. But if it can be determined that the defendant probably would have caused a greater loss had the fraud been realized, then that amount should be used in calculating "loss." To simply base the sentence on the face value of the loan without a finding that the defendant intended to walk away with the full amount fraudulently obtained, or that it even was probable that the victim would suffer such a loss contravenes the Guideline distinction between fraud and theft cases.

A number of circuits are in accord with this approach. *See, e.g., United States v. Shaw,* 3 F.3d 311 (9th Cir.1993) (sentencing court erred in determining "intended loss" as the face amount of a fraudulently obtained $2 million line of credit without calculating the actual loss to the bank and determining the defendant's subjective intent not to repay); *United States v. Galliano,* 977 F.2d 1350, 1353 (9th Cir.1992) (loss calculation at full amount of loan upheld based on finding that defendant never intended to repay the fraudulently obtained loans), *cert. denied,* —— U.S. ——, 113 S.Ct. 1399, 122 L.Ed.2d 772 (1993); *United States v. Willis,* 997 F.2d 407, 418 (8th Cir.1993) (finding that defendant intended to defraud bank of entire amount of loans obtained through the use of nominee borrowers by submitting false loan applications); *see also United States v. Baum,* 974 F.2d 496, 499 (4th Cir.1992) (value of the security interest deducted from amount of loan obtained through fraud); *United States v. Smith,* 951 F.2d 1164, 1167 (10th Cir.1991)

(absent actual loss, the mere exchange of value—collateral for a loan—could not justify an enhancement for the full value of the loan); *United States v. Kopp,* 951 F.2d 521, 531 (3d Cir.1991) (loss should be measured by actual loss suffered unless there was a greater probable or intended loss).

 Under the facts of this case, there is no dispute that the bank suffered no actual loss. By sheer fortitude, the bank discovered that Johnson had used the "working capital" loan to pay for the Porsche and proceeded to cancel both loan checks before disbursement. That there was no actual loss generated by the fraud, however, does not preclude a finding that a greater amount was intended or probable had the fraud gone undetected. § 2F1.1 comment n. 7; *United States v. Haggert,* 980 F.2d 8, 13 (1st Cir. 1992) (citing *Schneider,* 930 F.2d at 558); *see also Menichino,* 989 F.2d at 441–42 (loss calculated as the net value between the fraudulently obtained appraisal and the actual value of the collateral, even though no actual loss suffered); *United States v. Earles,* 955 F.2d 1175, 1180 (8th Cir.1992) ("loss" included amount of fraudulently obtained check even though victim's stop payment order prevented actual loss). For even without regard to the specific harm to a victim, it is still " 'fraud to impose an enormous risk of loss on one's [victim] through deliberate misrepresentation even when the risk does not materialize.' " *Strozier,* 981 F.2d at 284 (quoting *Schneider,* 930 F.2d at 558). In such a case, the "probable or intended" loss should be used if estimable. Proof that the defendant intended to cause loss in the full amount of the loan or evidence that a loss in that amount was probable must be established by a preponderance of the evidence.

---

**6.** At first blush, this rule may seem to conflict with *Schneider* which held that defendants who fraudulently obtained contracts should not be sentenced on the full value of the contracts when they intended to perform, or rather when there was no evidence that they did not intend to perform. This is simply another example of assessing "intended loss" by determining what the defendant probably would have "taken" had the fraud been realized. Even if the Schneiders'

fraud had gone undetected they could have expected to profit only the difference between the contract price and their costs. Likewise, the government probably would not have lost anything close to the contract price and, in fact, might have gained by dealing with the Schneiders. Still the Schneiders may have placed the government at risk by their fraud and, if quantified, that risk may serve as the "intended loss." *Schneider,* 930 F.2d at 558–59.

The question, then, is whether Johnson intended or realistically could have intended for the bank to incur a loss in the full amount of the loan proceeds. Johnson argues that he did not so intend, nor could the bank have realistically lost more than the value of the collateral securing the loans. This argument assumes that the interest the bank had in the collateral was risk free. The facts, however, belie this assumption. Johnson not only misrepresented that the loan was for working capital for his business, he submitted false financial information to induce the bank to make the loan.

Johnson's fraudulent representations involved more than simply misrepresenting the value of his assets to qualify for an otherwise unobtainable loan.[7] They included submitting a false social security number, failing to report two legal actions against him to collect debts relating to prior purchases of motor vehicles, and falsifying tax returns to reflect inflated income. Moreover, use of a false social security number did more than simply disguise an unfavorable credit history. It in essence provided a false identity which served to shield Johnson's fraudulent scheme, at least temporarily, from discovery. Cf. United States v. Johnson, 908 F.2d 396, 398 (8th Cir.1990) (defendant who used false identity to obtain loans found accountable for total value of loans even though actual loss was valued much lower). Finally, Johnson claimed ownership of the Porsche and offered it as collateral with full knowledge that title to the car had not been transferred to him.

Relying on these numerous misrepresentations, the district court concluded that "making a loan based upon intentionally incorrect and incomplete information greatly increases the risk of loss by the bank." Tr. 23. The "risk of loss" which the district court spoke of was what the bank reasonably could have expected to lose had the fraud been realized under these circumstances; it was not merely an equation to the possible loss. True, the bank took steps to ensure that it had a security interest in both vehicles. But given that Johnson's control over the collateral and his pattern of deceptive conduct so diminished the bank's chance of ever recovering had the fraud reached fruition, we cannot say that the district court's decision to hold Johnson accountable for the total amount of the loans was clearly erroneous. Under this view, there is no point in subtracting the value of the collateral from the probable or intended loss figure because, as the district court found, the interest in the collateral was far from risk-free.

### III. CONCLUSION

Even where there is no actual loss because the fraud was discovered or interrupted, the amount of loss expected or intended should be measured by subtracting the amount which the bank could have reasonably recovered by resort to assets securing the loan. In this case, there was no reason to subtract the value of the collateral because what the bank could have reasonably expected to recover was less than certain given Johnson's seemingly perpetual spree of fraudulent activity. Therefore, it was not clearly erroneous to find that had the scheme not been interrupted the loss that would have been inflicted equalled the total amount of the loans. For these reasons, the sentence imposed by the district court is AFFIRMED.

---

7. We note that the court might have reached the same result by departure. If after determining the actual loss and the intended or expected loss, the sentencing court believes that the "loss" calculation either understates or overstates the seriousness of the offense, the proper solution is to depart from the sentencing range. § 2F1.1(b), comment n. 7(b); Miller, 962 F.2d at 748. "For example, where the defendant substantially understated his debts to obtain a loan, which he nevertheless repaid, the loss determined above (zero loss) will tend not to reflect adequately the risk of loss by the defendant's conduct." § 2F1.1 comment n. 7. However, as noted, this was not simply a case of understating debts or overstating assets. There is no need for departure where the district court determines that the intended or probable loss adequately reflects the seriousness of the offense.