**UNITED STATES of America, Plaintiff–Appellee,**

v.

**John R. MOUNT, Defendant–Appellant.**

No. 92–1087.

United States Court of Appeals, Seventh Circuit.

Argued May 29, 1992.

Decided June 25, 1992.

Norman R. Smith, Asst. U.S. Atty., Suzanne M. Wissmann, argued, Criminal Div., Fairview Heights, Ill., for U.S.

Edward R. Joyce, argued, St. Louis, Mo., for John R. Mount.

Before CUDAHY, EASTERBROOK, and RIPPLE, Circuit Judges.

EASTERBROOK, Circuit Judge.

Ticket scalpers, like arbitrageurs in stock markets and dealers in gems, move assets in scarce supply toward those willing to pay the most for them. If promoters of an opera or rock concert underestimate the demand for the tickets and set prices too low, the initial buyers make a profit, while scalpers receive compensation for the service of moving the tickets from those who first acquire them to those who value them more highly. Promoters lose nothing from scalping in such cases, and everyone else may gain. See Stephen K. Happel & Marianne M. Jennings, *Assessing the Economic Rationale and Legal Remedies for Ticket Scalping*, 16 J. Legislation 1, 12–14 (1989).

Sometimes, however, promoters know that their prices are less than the market will bear. The smash hit play with a six-month wait for seats, the restaurant that always has a line snaking out the door, and the host for the Super Bowl, all charge less than customers would pay. They do so year in and year out, so mistaken estimates of demand cannot explain the practice. Both sides must gain something from the arrangement, whether the information other patrons provide or being able to discuss the event with additional friends. See Gary S. Becker, *A Note on Restaurant Pricing and Other Examples of Social Influences on Price*, 99 J.Pol.Econ. 1109 (1991). Scalping raises the effective price to the final customer without producing income for the promoter, so if the promoter's interests lie in holding price below the short-term market-clearing level, the promoter will oppose scalping.

Promoters of sporting events routinely oppose scalping and seek legislation against the practice, suggesting not only that they are willing to set prices below the level fans will pay but also that they want the monetary cost borne by the fan in the seat to fall below the market-clearing level. About half of the states and many cities have enacted laws regulating the resale of tickets. Happel & Jennings, 16 J. Legisla-

tion at 2–3; see also Thomas A. Diamond, *Ticket Scalping: A New Look at an Old Problem,* 37 U.Miami L.Rev. 71 (1982) (lower but earlier count). Efforts to suppress commerce lead to black markets, and often the black marketeers must evade other laws as well.

Steven Gray offered John Mount, a ticket broker, 30 strips of tickets to post-season games of the Minnesota Twins in 1991. Each strip contained tickets for the league playoffs and the World Series. Each strip had a face value of $400, which the Twins would collect from their customers. Although a strip contained eight tickets, as few as two games might be played in Minneapolis (if the Twins were swept in the league championship and so did not play in the World Series). The baseball club would repurchase unused tickets from owners, but only at face value. Scalpers who paid more were at risk, either from un-played games or unpopularity of the contests. But because the demand for playoff and World Series tickets is so high, Mount agreed to pay $1,000 per strip, anticipating betting against the Twins in Las Vegas in order to hedge his risks.

There was a catch. Baseball clubs do not sell strips of tickets to brokers. Season ticket holders get first call; blocs of tickets go to the league, to the press, and to the opposing team. Any tickets left over are sold on a first-come, first-serve basis, with strict limits on the number of tickets any fan may buy. Gray told Mount what Mount had to know anyway: that he obtained the strips by fraud. The stipulation of facts and the information provided at sentencing are not clear on the method, but apparently Gray or a friend who worked for the Twins used a ruse to obtain the tickets from the Twins' vault before they went on sale. Eventually the Twins would take an inventory, so the plan must have contemplated a way to avert a report that the tickets had been stolen. A stolen-ticket alert would have made the tickets in Mount's hands worthless (or caused his customers to come looking for him, if he sold them ducats that were ripped up at the gate in Minneapolis). Mount's concern was not, however, that the Twins get paid so much as it was that the tickets not be reported missing and presumed stolen.

Over the course of two weeks, Gray and Mount negotiated the details of delivery and payment in a series of telephone conversations. Mount wanted to pay by cashier's check so that he could document his expenses for tax purposes. Gray was not interested in leaving a paper trail and said that the deal had to be in cash, on top of which his trip had to be brief so that the money or the tickets could be back in the Twins' vault by the end of the day. Mount negotiated a check for $30,000 and bought 30 money orders of $1,000 apiece, to protect himself against theft while allowing him to buy fewer than all of the strips if the seating locations were not as promised or something seemed fishy.

Gray and Mount completed their transaction, with Mount buying all 30 strips. But things did not go as Mount planned. He never made it to Las Vegas. Gray had been cooperating with federal agents. The telephone conversations had been taped, and the agents swooped down shortly after the money orders and tickets changed hands. The Twins got the strips back, the $30,000 was seized for forfeiture, and Mount pleaded guilty to wire fraud, in violation of 18 U.S.C. § 1343. He was sentenced to six months' imprisonment and protests that this was based on an incorrect application of the sentencing guidelines.

Guideline 2F1.1, which applies to wire fraud, establishes a base offense level of 6. The district judge added 3 more after concluding that the offense involved a "loss" of more than $10,000 but less than $20,000, see § 2F1.1(b)(1)(D), and another 2 on finding that "the offense involved ... more than minimal planning", § 2F1.1(b)(2)(A). Subtracting 2 for acceptance of responsibility yielded an offense level of 9, which, when combined with a criminal history category of II, generated a sentencing range of 6–12 months. The court gave Mount the lowest sentence in the range. Mount's calculation, by contrast, omits all enhancements and produces a final offense level of 4 and a range of 0–6 months' imprisonment.

The prosecutor observes that the court selected a sentence, six months, that appears in both ranges. He contends that the choice of offense levels therefore makes no difference. If the range does not affect the outcome, we may affirm without deciding whether the district judge figured correctly. Overlapping ranges make it possible for judges to give sentences that are lawful no matter which way they resolve a point of law, and "[i]t is hard to think of any reason for the Sentencing Commission to have gone to such lengths to build overlapping into the table if it did not expect this feature to reduce the number of disputes that needed to be adjudicated in the application of the guidelines." *United States v. Dillon*, 905 F.2d 1034, 1037 (7th Cir.1990), quoting from *United States v. Bermingham*, 855 F.2d 925, 930 (2d Cir. 1988).

The prosecutor's argument, however, assumes that judges choose one "right" sentence rather than deciding that this defendant belongs at the low, middle, or upper end of a range. When judges follow the latter course, the choice of range may determine the sentence even when ranges overlap. There can be no rule that an error in determining the range is irrelevant just because the sentence appears in the lawful range; the question instead is whether the legal decision affected the outcome. "[T]he party challenging the sentence on appeal, although it bears the initial burden of showing that the district court relied upon an invalid factor at sentencing, does not have the additional burden of proving that the invalid factor was determinative in the sentencing decision. Rather, once the court of appeals has decided that the district court misapplied the Guidelines, a remand is appropriate unless the reviewing court concludes, on the record as a whole, that the error was harmless, *i.e.*, that the error did not affect the district court's selection of the sentence imposed." *Williams v. United States*, — U.S. —, 112 S.Ct. 1112, 1120–21, 117 L.Ed.2d 341 (1992). An appellate court may be confident that the choice of range did not affect the sentence when the district judge says so. The judge could say, for example, that although he believes the pretrial services officer's calculation correct, he would impose the same sentence even if he accepted the defendant's calculation. Judge Stiehl did not say this, and we doubt that it is true. Six months was the floor of the range the court used and the pinnacle of the range Mount proposes. So the range may well have altered the sentence, and we must decide whether the court constructed it correctly.

Extended phone conversations, plans to lay off risk in Las Vegas, and the purchase of 30 money orders prior to a carefully arranged meeting show that this was no spur-of-the-moment deal and support a finding of "more than minimal" planning. See § 1B1.1, application note 1(f), cross-referenced in § 2F1.1, application note 2. See also *United States v. Maciaga*, 965 F.2d 404 (7th Cir.1992). Deferential review on matters of inference and line-drawing under the guidelines, *United States v. Lennick*, 917 F.2d 974, 979 (7th Cir.1990), leaves no room for us to substitute our view for the district judge's. The only substantial question on appeal then is the meaning of "loss" in § 2F1.1(b)(1), a legal question on which our review is plenary.

Both the Sentencing Commission's notes defining "loss", see § 2B1.1 (commentary) and § 2F1.1, application note 7, and this court's cases, e.g., *United States v. Schneider*, 930 F.2d 555 (7th Cir. 1991), call for the court to determine the net detriment to the victim rather than the gross amount of money that changes hands. So a fraud that consists in promising 20 ounces of gold but delivering only 10 produces as loss the value of 10 ounces of gold, not 20. Borrowing $20,000 by fraud and pledging $10,000 in stock as security produces a "loss" of $10,000: "the loss is the amount of the loan not repaid at the time the offense is discovered, reduced by the amount the lending institution has recovered, or can expect to recover, from any assets pledged to secure the loan." Guideline 2F1.1, application note 7(b). Mount's situation initially looks to be a variant of

the fraudulent loan. Gray "borrowed" the tickets from the vault by fraud but was planning to replace them with $12,000, so the Twins would recover in full, and Mount relied on this to avoid a report of theft. Loss to the victim: zero. That is the foundation of Mount's argument.

By contrast, the United States contends that the loss was $30,000, the amount a willing buyer paid for the tickets. Gray got the tickets by fraud; they were worth at least $30,000 (Mount must have expected to realize even more); as the Twins lost the tickets, the club must have lost $30,000. The district court chose $12,000 as the loss after observing that the Twins were willing to part with the strips for that sum and therefore *the Twins* "lost" only that sum even though its fans valued the tickets at more than face price. The prosecutor defends this calculation on appeal, observing that Gray might have skipped with the full $30,000, so that the Twins were at risk for at least $12,000. An embezzler who abstracts $10,000 to invest in the stock market causes a "loss" of $10,000 even if he plans to repay before the next audit (to avoid detection) and even if he invests only in blue chip stocks.

The difference between gross and net loss matters if the offender has paid in part before detection, or the victim has access to a ready source of compensation such as the assets securing the fraudulently-obtained loan. The embezzler causes loss in the full amount taken, despite plans to repay, because the employer is at risk in the interim and lacks a ready source of recompense. The Twins, too, were at risk, and although Gray was perhaps more likely than the average embezzler to put the $12,000 in the vault, the risk was substantial. For all Mount knew, Gray had devised some method to jigger the books to disguise the transaction, keeping the full $30,000. What mattered to Mount was not that the Twins be paid, but that they be none the wiser and honor the tickets.

Let us examine the possibility most favorable to Mount. Suppose Gray had swapped $12,000 for the strips in a single transaction, so that when he met Mount the

money was in the Twins' vault and would stay there. Would it follow that the Twins suffered no loss? Even in such a case, we believe, the baseball club would suffer at least $18,000 in loss, the bargain element (market value less purchase price) offered to the fans. A vendor may choose its customers, and the fraud in a case such as this deprives the seller of that choice—a valuable commodity indeed when the seller knows that it is offering a bargain. Think of a father who sells a $20,000 automobile to his daughter for $5,000. The transaction is a gift of $15,000 (as the parent must recognize when the time comes to file a gift tax return). If the car were stolen the night before the transfer to the child, the parent's loss would be $20,000—and if the car were stolen the day after, the daughter's loss would be the same $20,000.

So too with tickets sold at a bargain price. The Minnesota Twins are not discounting tickets out of filial devotion, for unlike a parent the club does not derive utility from making its customers better off as such. Nonetheless the team has business reasons to set low prices and derives value (out of which Gray and Mount defrauded it) by being able to make these gifts. Perhaps the below-market prices are deferred rebates, the payoff to loyal fans who have stuck with the team through lean times. Fans may choose to resell rather than attend the game, but then the fan reaps the difference between face and market price, whereas Gray appropriated that difference to himself, with Mount's aid. (Consider: what is the Twins' loss if someone steals 10,000 caps the team plans to give away at the next game? Mount's argument implies that the loss is nil because the team is not planning to charge separately for the caps.) Perhaps the team uses an allotment of tickets to cement business or political allegiances—for a mayor sitting in a box seat may be more inclined to support improvements to the stadium. Perhaps the team is buying public support, fearful that "price gouging" at World Series time would dampen enthusiasm for the team next year. No matter why the Twins set the prices as they did, the difference between face and market price was an ele-

ment of value to the Twins. Mount's fraud, if successful, would have deprived the team of that value. So the amount of this fraud exceeds $10,000, and the judgment is

AFFIRMED.

RIPPLE, Circuit Judge, concurring.

I join the judgment of the court. The district court valued the Twins' loss at $12,000. This is a common-sense approach that avoids making the term of a criminal sentence turn on conjecture. On this basis, affirmance of the judgment of the district court is clearly warranted.