In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

Nos. 22-1293 & 22-2138

UNITED STATES OF AMERICA,

*Plaintiff-Appellee/Cross-Appellant,*

*v.*

BRUCE LEE,

*Defendant-Appellant/Cross-Appellee.*

———————————

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 20 CR 67 — **Matthew F. Kennelly**, *Judge.*

———————————

ARGUED MAY 18, 2023 — DECIDED AUGUST 9, 2023

———————————

Before WOOD, LEE, and PRYOR, *Circuit Judges.*

WOOD, *Circuit Judge.* Scalping tickets to popular athletic events or concerts is nothing new, but there are legal limits to how far one can go with that practice. Bruce Lee crossed the line when he carried out a scheme to defraud the Chicago White Sox. With the help of two White Sox employees, Lee obtained thousands of discounted and free game tickets and resold them online for profit. He was caught three years into

the scheme, and a federal jury convicted him of wire fraud in violation of 18 U.S.C. § 1343.

Although the indictment expressly sought forfeiture of Lee's ill-gotten gains and Lee raised no objection to that request, the parties disagreed on the amount he would have to pay. What should have happened next was the entry of a preliminary order of forfeiture specifying what would be due and what property was subject to forfeiture. See Fed. R. Crim. P. 32.2(b)(2). Unfortunately, the district court skipped that step. It did everything else necessary for forfeiture, however, including giving Lee notice and an opportunity to contest the amount the government was seeking and orally imposing forfeiture in the sentence, along with an 18-month prison term, restitution, and the required special assessment. The written judgment, however, omitted forfeiture. After some additional proceedings, the court threw its hands up and concluded that it was too late to enter a proper forfeiture order, and so it refused to amend the written judgment to reflect its oral sentence.

On appeal, Lee raises a host of issues, including challenges to the indictment, the court's denial of his motion for acquittal, and his sentence. In the end, we conclude that none requires reversal. The government has cross-appealed from the court's refusal to amend the judgment to include forfeiture. Because the written judgment should conform to the oral sentence, we reverse and remand for the district court to amend the judgment under Federal Rule of Criminal Procedure 36 to include forfeiture in the amount the court found, $455,229.23. See Fed. R. Crim. P. 32.2(b)(4)(B).

**I**

Like any other enterprise, Major League Baseball teams use marketing and business strategies to keep their fan base enthusiastic. The Chicago White Sox are no exception. Beginning in 2015, the club distributed promotional vouchers during late-season games. Fans could exchange those vouchers for discounted tickets to the following season's games (either a free upper-deck seat or a $5 outfield seat). In addition, starting in 2017, the White Sox introduced an additional code, RAIN17, to be used when a fan wanted to exchange a ticket to a game cancelled on account of weather for a new game. The White Sox did not give out these tickets just to be nice. They hoped to improve their public relations, encourage fans to return to the stadium, and reap other intangible benefits.

This business strategy was implemented through certain rules. To redeem the tickets, fans had to exchange their rained-out tickets or vouchers at the booth (no more than four at a time). Because discounted tickets were designed for promotional purposes, the terms and conditions printed on their back side forbade fans from reselling them. Box-office employees also had to follow strict guidelines. They were required to place the rained-out tickets and vouchers in a box behind the booth, but no one ever checked what was in the box. In addition, the employees had to use their personal employee code to log into the system before processing each redeemable ticket or voucher. These safeguards were meant to preclude fans and employees from reusing rained-out tickets or vouchers or otherwise profiting from them. But the White Sox overlooked a key precautionary measure. Employees were not required to keep a record of the rained-out tickets and vouchers that had been collected—they were shredded

instead—nor did anyone attempt to reconcile the new tickets sold with the redeemed tickets and vouchers.

Realizing with the help of some insiders that there was no auditing mechanism, Bruce Lee saw an opportunity to profit. Between March 2016 and March 2019, Lee partnered with two White Sox employees to obtain thousands of tickets for resale without the *quid pro quo* of rained-out tickets or vouchers. At the start of the 2016 season, he connected with James Costello, a box-office worker. Costello provided Lee with $5 outfield tickets without collecting vouchers in exchange. Lee would give Costello $5 per ticket, which Costello then would deposit in the till so that it would not come up short. He charged Lee an additional fee per ticket for his services. At that point, Lee was able to sell the tickets for whatever they would bring.

In 2017, Costello recruited William O'Neil, another ticket-booth employee. That was the year when the White Sox started using the RAIN17 code for complimentary tickets exchanged for the fan's tickets for rained-out games. With another insider in the booth and a wider variety of tickets to print, Costello devised a more sophisticated scheme. He asked Lee to give him a large sum of cash upfront; Lee obliged. Throughout the season, Lee texted Costello how many tickets he needed and for which games. Costello then removed money from the envelope where the cash was stored to "pay" for the $5 outfield seats; he withdrew nothing for the free upper-deck tickets or the rain substitutes. Costello continued to charge fees for his services (which he took out of the cash reserve) and shared a small portion of the profits with O'Neil. Throughout the season, in order to avoid detection, Costello and O'Neil printed tickets in small batches, refrained from processing tickets if a supervisor was in the ticket booth,

and used other employees' operator codes to log into the system.

Lee resold the tickets he had obtained in this manner on Stubhub.com, an online ticket marketplace. He chose that website because buyers could not see images of the physical tickets, which allowed him to conceal the tickets' real value and source. Each time Lee sold a ticket, StubHub sent him an email detailing the transaction; another email followed detailing the amount StubHub paid Lee (purchase price less StubHub fees). Depending on the number of tickets he sold, Lee could gauge which games were in high demand and ask Costello and O'Neil for additional tickets if needed.

The White Sox detected the scheme in the fall of 2018 and immediately informed the Federal Bureau of Investigation (FBI). At the beginning of the 2019 season, Costello and O'Neil provided discounted and complimentary tickets to Lee from March 5 to March 10, but FBI agents approached them on March 12. Trapped, Costello agreed to cooperate with the officers and recorded incriminating conversations with Lee. On March 23, the agents confronted Lee, putting an end to his operation.

Lee's plot had been very profitable. From 2016 to 2019, Lee sold 12,910 discounted tickets and 21,936 complimentary tickets on StubHub; in the aggregate, he collected $867,269. He paid the White Sox only $74,650 for the $5 discounted tickets and nothing at all for the complimentary tickets. Costello received over $100,000 and O'Neil approximately $5,000 in fees.

In January 2020, Lee, Costello, and O'Neil were indicted. Costello pleaded guilty to one wire-fraud count and was sentenced to three years' probation; O'Neil pleaded guilty to

making a false statement to the FBI and also was sentenced to three years' probation. Lee was charged with 11 counts of wire fraud in violation of 18 U.S.C. § 1343 and two counts of money laundering in violation of 18 U.S.C. § 1957. The indictment also sought forfeiture of Lee's gain in the amount of $867,269. After an unsuccessful motion to dismiss the indictment under Federal Rule of Criminal Procedure 29(a), Lee's case proceeded to trial in October 2021. Before the jury began deliberating, Lee moved for acquittal on all grounds. The district court granted the motion insofar as it applied to the money-laundering counts and otherwise denied it. The jury returned a guilty verdict on the wire-fraud counts, and the court later denied Lee's post-trial motion under Rule 29(c) for acquittal.

Before sentencing, the government renewed its request for forfeiture of the full $867,269 Lee had gained. Lee conceded that forfeiture applied but argued for approximately $455,000, reflecting his net gains. The district court was required by Federal Rule of Criminal Procedure 32.2(b) to enter a preliminary forfeiture order in advance of sentencing, but it failed to do so. At sentencing the court adopted Lee's forfeiture calculation, ordered forfeiture in that amount, and sentenced Lee to 18 months in prison. Yet, overlooking Rule 32.2(b)(4)(B)'s instructions, the court did not include forfeiture in the written judgment. Realizing the procedural snarl that was developing, the government then filed a motion asking the court to enter a preliminary order of forfeiture and to amend the judgment accordingly. The court refused. After missing the deadlines outlined in Rule 32.2, the court concluded that it lacked the authority to amend the judgment. This appeal and cross-appeal followed.

## II

### A

Lee first contests the district court's denial of his motion to dismiss the indictment, a challenge that we assess *de novo*. See *United States v. Friedman*, 971 F.3d 700, 710 (7th Cir. 2020). In order to succeed on the wire-fraud counts, the government had to prove that Lee: "(1) was involved in a scheme to defraud; (2) had an intent to defraud; and (3) used the wires in furtherance of that scheme." *United States v. Durham*, 766 F.3d 672, 678 (7th Cir. 2014); see 18 U.S.C. § 1343. The indictment alleged that Lee participated in a scheme in which Costello and O'Neil "fraudulently generated thousands" of tickets, which they gave to Lee "for re-sale in exchange for cash payments." The indictment further alleged that Lee resold those tickets on StubHub "at prices below face value," and that he chose StubHub "in part[] because he believed this method of sale would conceal the source of the tickets." The 11 acts of wire fraud with which Lee was charged fell into three categories: (1) emails from StubHub to Lee detailing that a ticket had been sold to a StubHub customer, (2) emails from StubHub to Lee informing Lee that proceeds from the sales had been deposited in his account, and (3) electronic wire transfers of funds from StubHub's bank account to Lee's bank account.

In his motion to dismiss, Lee argued that the indictment was prejudicially duplicitous because it alleged two separate schemes in each wire-fraud count: one to obtain White Sox tickets, and the other to resell them on StubHub. He insisted that only the first scheme was fraudulent; the second was legal because he sold real tickets to third parties. Hence, he concluded, the indictment included wires that did not further a scheme to defraud because they related only to legal

transactions. The district court found this argument wanting, and so do we.

"An indictment that charges two or more distinct offenses within a single count is duplicitous." *United States v. Hassebrock*, 663 F.3d 906, 916 (7th Cir. 2011). "However, an indictment charging multiple acts in the same count, each of which could be charged as a separate offense, may not be duplicitous where these acts comprise a continuing course of conduct that constitutes a single offense." *United States v. Buchmeier*, 255 F.3d 415, 421 (7th Cir. 2001). In determining whether several acts constitute a single scheme, we ask whether the transactions have a "sufficiently close nexus with one another[.]" *United States v. Zeidman*, 540 F.2d 314, 317 (7th Cir. 1976).

To determine whether Lee's scheme operated as a continuing course of conduct, it is helpful to look at what he sought to gain from it. Lee was not a collector seeking to keep the tickets for himself as a philatelist might. Instead, his goal was to obtain White Sox tickets to profit from their resale. As the district court explained, because the tickets "were relatively worthless … just [sitting] in his hands," reselling them on StubHub was an "essential part" of Lee's overall plan. Both activities (obtaining and reselling) were necessary in order to succeed in the goal of profiting at the expense of the White Sox. The indictment was thus not duplicitous. See, *e.g.*, *United States v. Sampson*, 371 U.S. 75, 80 (1962) (upholding indictment that "alleged that the defendants' scheme contemplated from the start the commission of fraudulent activities which were to be and actually were carried out both before and after the money was obtained from the victims"); *United States v. Faruki*, 803 F.3d 847, 853–54 (7th Cir. 2015) (holding defendant engaged in a single fraudulent scheme where he procured

investments in hedge fund in order to wire money to other accounts).

Lee resists this conclusion, arguing that the White Sox "do not lose money or property when a ticket is resold on Stub-Hub." Because the White Sox were neither involved in nor affected by the sale of the tickets on StubHub (as Lee sees it), "the[] differences in participants, methods, and objectives demonstrate that there are two separate schemes, not a continuing course of conduct." Lee misses the point.

As we have noted before, "[baseball] team[s] [have] business reasons to set low prices and derive[] value … by being able to make these gifts." *United States v. Mount*, 966 F.2d 262, 266 (7th Cir. 1992) (discussing value of discounted baseball tickets for sentencing purposes). These reasons may include "[paying off] loyal fans who have stuck with the team through lean times," "us[ing] an allotment of tickets to cement business or political allegiances," and "buying public support." *Id.*

The White Sox are no different. The district court thus properly denied Lee's motion before trial, and the evidence at trial confirmed our reasoning in *Mount*. William Snell, Director of Business Analytics at the White Sox, testified that the club gave out discounted tickets at the end of the season as a "marketing tool" and for "goodwill." Snell explained that the White Sox often compare the team's internal pricing ("primary market") to StubHub's pricing ("secondary market"). If there are suddenly "20,000 tickets for sale on a secondary market" at a lower price, "it may cause volatility in the market and hurt [the team's] sales." Furthermore, the club has an economic interest in "creat[ing] a level playing field" for "fans that are buying tickets."

When Lee diverted promotional tickets from the fans and inundated the market with thousands of artificially low-priced tickets (that is, tickets sold above the $0 or $5 at which the team valued them), the White Sox were economically harmed by Lee's course of conduct. And because the tickets' sale was key to the success of Lee's scheme, the wire transfers confirming those sales were part of the plot. See *Schmuck v. United States*, 489 U.S. 705, 710–11 (1989).

B

We now turn to Lee's trial motion for acquittal. We review *de novo* the court's denial, "asking whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Hernandez*, 952 F.3d 856, 859 (7th Cir. 2020).

Lee's first contention tracks the arguments in his motion to dismiss the indictment. He claims that even if the indictment is sufficient on its face, the evidence at trial did not prove that the interstate wires furthered his fraudulent scheme. But that evidence easily raised a jury issue.

Lee profited through funds wired from StubHub's bank account to his account. Although Lee might have been able to sell tickets on another website, the government did not need to prove that the wires were an "indispensable part of the fraud," only that they were "incident to an essential part of the scheme … or a step in [the] plot." *United States v. Powell*, 576 F.3d 482, 493 (7th Cir. 2009) (alteration in original) (quoting *Schmuck*, 489 U.S. at 710–11). A reasonable jury could conclude that the wire transfers allowed Lee to profit from reselling tickets and thus furthered the fraud.

The jury also was entitled to find that the StubHub emails furthered the scheme. After each ticket sale, StubHub sent Lee an email with the purchase price and information about the game. At trial, the government introduced texts showing that Lee knew whenever he sold tickets for popular games. This information prompted him to procure more tickets to meet the demand. A reasonable jury could infer that Lee used Stub-Hub's emails to monitor sales, decide how many tickets to obtain for specific games, and gauge the overall success of the scheme.

Finally, a reasonable jury could conclude that Lee chose StubHub as a ticket platform to conceal the source of the tickets. Wire communications "that assist the defendant in avoiding detection may be sufficient to further a scheme." *United States v. McGowan*, 590 F.3d 446, 457 (7th Cir. 2009). At trial, the government introduced a recorded conversation between Lee and Costello. Costello was concerned because his personal operator code was on some of the tickets, but Lee reassured him, explaining that StubHub gives the tickets a "different barcode number" and "don't say no price." He added, "I just sold [tickets] on Stubhub, so nobody could see, like, how much I paid for the ticket, how much it cost" because "there's no way they can see the face [of the actual ticket], trust me." The jurors were entitled to find, from this and similar evidence, that the StubHub emails allowed Lee to avoid detection.

Lee next argues that the evidence at trial failed to show that he committed fraud because his scheme did not involve material misrepresentations or concealed facts. Once again, he underestimates the record.

A material misrepresentation is "one relevant to the decision that the perpetrator of the fraud wants his intended victim to make." *United States v. Coffman*, 94 F.3d 330, 335 (7th Cir. 1996). The evidence at trial showed that Costello and O'Neil knowingly violated White Sox policies by providing Lee with complimentary and discounted tickets without receiving vouchers or rained-out tickets in exchange. They abstained from printing tickets if other employees or supervisors were present, and they printed tickets only in small batches to avoid calling attention to their activities. Hoping that managers would not notice an unusually large number of complimentary and discounted tickets sold under their operator codes, they also logged into the computer system using other employees' operator codes. The jury was entitled to find that this conduct amounted to misrepresentations.

Lee counters that the misrepresentations were immaterial because the White Sox "did not collect anything or track whether the person receiving a complimentary code was entitled to use that code." The team was planning to give those tickets away for free or at a heavily discounted price anyway. He thus argues that the misrepresentations "were incapable of influencing the decision of the White Sox." But the jury was entitled to find that Costello and O'Neil's façade was relevant to decisions that they wanted the club to make, including the decision to allow them to keep their position as ticket sellers so that they could continue the fraud. Indeed, as soon as the White Sox discovered the scheme, the team immediately contacted the FBI, implying that they would not have authorized ticket sales to Lee had they known about the fraud. That the White Sox did not have a monitoring system is irrelevant, because "the perpetrator of a fraud may not defend himself by

blaming the victim for being duped." See *United States v. Serfling*, 504 F.3d 672, 679 (7th Cir. 2007).

## III

Lee also challenges his sentence on appeal, arguing that the district court erred in calculating loss under the advisory sentencing guidelines. "We review *de novo* the district court's definition of loss, the method it uses to measure the loss, and the sentencing procedure." *United States v. Klund*, 59 F.4th 322, 326 (7th Cir. 2023) (quoting *United States v. Yihao Pu*, 814 F.3d 818, 823 (7th Cir. 2016)). "We review the district court's loss calculation for clear error." *Id.* (quoting *Yihao Pu*, 814 F.3d at 823).

## A

Offenses involving fraud have a base offense level of seven under the guidelines; the level is then increased based on the amount of loss to the victim. See U.S.S.G. § 2B1.1(a), (b)(1). "[L]oss is the greater of actual loss or intended loss." *Id.* § 2B1.1 n.3(A). Both parties agree that actual loss is at issue here. It is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.* § 2B1.1 n.3(A)(i). If the loss cannot reasonably be quantified, the defendant's gain may be used as an alternative. *Id.* § 2B1.1 n.3(B).

At sentencing, the government argued that the White Sox's loss should be based on the fair market value of the fraudulently obtained tickets, reasoning that buyers would have purchased the tickets from a legitimate seller had it not been for Lee's fraud. The government offered three possible estimates of the tickets' fair-market value, all of which yielded a loss in the range of $550,000 to $1,500,000 and resulted in a 14-level increase. See *id.* § 2B1.1(b)(1). Lee argued that the loss

should be $74,650, the price at which the White Sox were willing to sell the 12,910 discounted outfield tickets to fans and for which Lee paid $5 each. (The White Sox handed out upper-deck discounted tickets and complimentary tickets for free, so in Lee's view these could not have inflicted an economic loss on the team.) He relied on *United States v. Mount*, which he claimed stands for the proposition that loss is the sum that the victim was "willing to part with." See 966 F.2d at 266.

The district court rejected both parties' estimates, reasoning that they did not address what would have happened "but for" Lee's fraudulent scheme. The court hypothesized that the White Sox could have sold some of those tickets at market value, but others would have remained unsold in the team's inventory. Unable to make a reasonable determination of loss, the court turned to Application Note 3(B) to Guideline § 2B1.1 and used Lee's gain as an alternative measure of loss. Lee's gain was $867,269, which also fell within the $550,000 to $1,500,000 range proposed by the government. The court further ruled that Lee's gain should not be reduced by his costs, in the form of his fee payments to Costello and O'Neil and the $74,650 he paid to the White Sox. With a base level of seven, a 14-level enhancement based on Lee's gain, and a criminal history category of III, the applicable advisory guideline range was 46 to 57 months. The court chose a sentence of 18 months in prison.

B

On appeal, Lee continues to rely on *Mount.* But that case actually supports the government, not him. In *Mount*, the Minnesota Twins set aside strips of tickets to post-season games. The team was planning to sell them at a below-market

price of $400 per strip. An insider who was cooperating with federal agents offered Mount 30 strips for $1,000 per strip, for a total of $30,000. The insider told Mount that he was planning to use $12,000 of that sum to pay the Twins for the face value of the tickets, after which he was planning to pocket the difference. For his part, Mount was planning to sell the tickets for profit. Mount and the insider completed the transaction, but soon thereafter, federal agents seized the money and recovered the tickets. At sentencing, Mount argued that the intended loss was zero because the Twins were going to receive the tickets' face value ($12,000). The government argued for a loss of $30,000, which was "the amount a willing buyer paid for the tickets." *Mount*, 966 F.2d at 266. The district court held that the loss was $12,000 (not yet paid to the team), noting "that the Twins were willing to part with the strips for that sum and therefore *the Twins* 'lost' only that sum even though its fans valued the tickets at more than face price." *Id*.

We affirmed the district court's ruling but under a different rationale. We reasoned that even if the insider had paid the Twins for the value of the strips, it does not follow that the Twins would not have suffered a loss: "A vendor may choose its customers, and the fraud in a case such as this deprives the seller of that choice—a valuable commodity indeed when the seller knows that it is offering a bargain." *Id.* As we noted earlier, the Twins had ample reason to offer discounted tickets. The proper standard to calculate loss, we concluded, was "the difference between face and market price," which was $18,000. *Id.* We held that the district court did not clearly err because "the amount of [the] fraud exceeds $10,000 [but is less than $20,000]" under either loss calculation. *Id.* at 267.

*Mount* thus confirmed that the power to choose with whom to deal has economic value, which is why the starting point to calculate loss should be the tickets' market price, as the government argues. Lee's contention that loss should be the sum that the White Sox were "willing to part with" is based on the methodology that the *district court* applied in *Mount*, but that we rejected.

Having dispensed with Lee's argument, we can easily affirm the district court's sentence of imprisonment. Whether we use the tickets' fair-market value under any of the government's estimates or Lee's gain of $867,269, the White Sox's loss would still fall within the guidelines range of $500,000 to $1,500,000. That is so even if we subtract Lee's costs ($100,000 paid to Costello and $74,650 paid to the White Sox) from the lowest possible sum (*i.e.*, Lee's gain of $867,269), which results in a loss amount of $692,619, still well over $550,000. Finally, the district court did not clearly err when it used Lee's gain as an alternative measure to loss.

## IV

The most difficult part of this case is the subject of the government's cross-appeal: whether, under the circumstances presented here, the district court had the power to amend the judgment to include forfeiture under Federal Rule of Criminal Procedure 36. This requires an interpretation of the governing rules of criminal procedure, and so our evaluation is *de novo*. *United States v. Wyatt*, 9 F.4th 440, 450 (7th Cir. 2021).

## A

Federal Rule of Criminal Procedure 32.2 sets forth specific steps for imposing forfeiture. Its language is crucial here, and so we begin by setting out its key provisions:

(b) Entering a Preliminary Order of Forfeiture.

(1) Forfeiture Phase of the Trial.

(A) Forfeiture Determinations. As soon as practical after a verdict or finding of guilty, or after a plea of guilty or nolo contendere is accepted, on any count in an indictment or information regarding which criminal forfeiture is sought, the court must determine what property is subject to forfeiture under the applicable statute. …

(B) Evidence and Hearing. The court's determination may be based on evidence already in the record, including any written plea agreement, and on any additional evidence or information submitted by the parties and accepted by the court as relevant and reliable. If the forfeiture is contested, on either party's request the court must conduct a hearing after the verdict or finding of guilty.

(2) Preliminary Order.

(A) Contents of a Specific Order. If the court finds that property is subject to forfeiture, it must promptly enter a preliminary order of forfeiture setting forth the amount of any money judgment, directing the forfeiture of specific property, and directing the forfeiture of any substitute property if the government has met the statutory criteria. …

(B) Timing. Unless doing so is impractical, the court must enter the preliminary order

sufficiently in advance of sentencing to allow
the parties to suggest revisions or modifications
before the order becomes final as to the defend-
ant under Rule 32.2(b)(4).

\*\*\*

(4) Sentence and Judgment.

(A) When Final. At sentencing—or at any
time before sentencing if the defendant con-
sents—the preliminary forfeiture order be-
comes final as to the defendant. …

(B) Notice and Inclusion in the Judg-
ment. The court must include the forfeiture
when orally announcing the sentence or must
otherwise ensure that the defendant knows of
the forfeiture at sentencing. The court must also
include the forfeiture order, directly or by refer-
ence, in the judgment, but the court's failure to
do so may be corrected at any time under Rule
36.

Rule 36 permits the court "at any time [to] correct a clerical
error in a judgment [or] order … ."

### B

Initially, the court in our case followed the Rule's prescrip-
tions. As required by Rule 32.2(a), the indictment sought for-
feiture of Lee's gain under 18 U.S.C. § 981(a)(1)(C), 26 U.S.C.
§ 2461(c), and 21 U.S.C. § 853(p). Lee waived his right to have
the jury determine the forfeiture amount, see Rule
32.2(b)(5)(A), and so that responsibility fell on the court's
shoulders.

The next thing that should have happened would have been the entry of a preliminary order of forfeiture pursuant to Rule 32.2(b)(1)(A). Such an order must be entered "as soon as practical after a verdict or finding of guilty." Unfortunately, however, the court overlooked this step. Instead, after the verdict of guilty but before sentencing Lee, it launched directly into an exploration of the issue of forfeiture. The parties disputed the proper amount: Lee argued that forfeiture should be measured by his gross profits minus expenses, for a final amount of $455,229.23, while the government contended that in this case Lee's gross gain ($868,269) was the correct amount.

The first sentencing hearing was held on February 10, 2022. There the parties and the court discussed Lee's sentencing guidelines range and the applicable restitution amount. They expressly left discussion of forfeiture for a later date. Five days later, the parties and the court reconvened for a second sentencing hearing, at which there was a thorough airing of the parties' positions regarding the applicable forfeiture amount. In the end, the court sided with Lee. Noting that forfeiture is defined as "the gross proceeds less deductions," the court announced that "the forfeiture figure is going to be $455,229.23." The court then discussed the sentencing factors identified in 18 U.S.C. § 3553(a), declaring that Lee is "going to have to pay a very large financial penalty. He's going to be separated from all of his gains." After sentencing Lee to 18 months in prison, the court asked the parties whether they thought it had overlooked anything. Their answer was no. The court entered final judgment on February 17 and an amended judgment on March 7 (on grounds unrelated to forfeiture). Despite the court's oral ruling on forfeiture at sentencing, the written judgment failed to mention forfeiture.

There matters stood until March 18, when the government (obviously realizing the procedural irregularities that had crept into the proceedings) filed a motion asking the court to enter a preliminary forfeiture order consistent with the court's ruling at sentencing. Lee did not object to the government's motion. After nearly two months without action from the court, the government filed a second motion for a preliminary order of forfeiture on May 13. This time, Lee filed an objection, in which he argued that the court lacked the authority to enter a post-sentencing preliminary order. Because the court had failed to enter a preliminary order before sentencing, Lee argued, there was no order that could have become final at sentencing. In his view, that was a clear substantive error that had to be corrected within 14 days after entry of judgment under Federal Rule of Criminal Procedure 35—a deadline that had long passed.

The court denied the government's motion, reasoning that it lacked jurisdiction to amend the judgment to include forfeiture after sentencing. The court explained:

> [T]here's no question I made a finding at the sentencing regarding the amount of forfeiture to Mr. Lee. I made a finding regarding the amount of the forfeiture, which was a contested matter.
>
> I did not do – I didn't enter a preliminary order of forfeiture, and I don't think I formally said, I'm granting the motion for preliminary order of forfeiture. That was a mistake on my part. I intended to.

The court further reasoned that Rule 32.2(b)(4)(B) directs the court to include the forfeiture order directly or by reference in the judgment. "That [directive] refers to an order," the

judge said, "And it seems to me that logically it relates back to the visions [*sic*] of Rule 32.2 that require entry of a preliminary order of forfeiture." The court concluded that its failure to enter a preliminary order was not a clerical error correctable under Rule 36, but instead a clear error subject to Rule 35. It thus denied the government's motion to conform the written judgment to the oral pronouncement of forfeiture. The government has appealed from that ruling.

C

We must decide whether the district court's failure to enter a preliminary order of forfeiture is correctable at this time, or if it can be regarded as harmless error. This requires a deeper dive into the nature of the timing requirements for forfeitures. The government asks us to treat the district court's mistake as the type of clerical error that can be corrected under Rule 36. If that is the correct characterization, we could easily reverse and remand for the district court to enter a final order conforming the written judgment to its oral pronouncement of forfeiture. (The government has dropped its argument that what the district court should do is enter a preliminary order.) Lee insists that no forfeiture at all is possible without the preliminary order contemplated by Rule 32.2(b)(2), and that it is far too late to enter such an order now.

We are not the first court to encounter the problem of a missing preliminary order of forfeiture. Our colleagues in the Second, Fourth, Sixth, and Eighth Circuits have faced several variants of that issue. It appears at first glance that there is a conflict in the results they have reached, though as we now explain, a closer look at the decisions suggests that there may be less difference than meets the eye.

1

Their starting point, and ours, is with the Supreme Court's decision in *Dolan v. United States*, 560 U.S. 605 (2010). *Dolan* was about "the remedy for missing a statutory deadline," *id.* at 607, in the context of mandatory restitution for victims of crime. The governing statute required the district court to make a final determination of losses for purposes of restitution no later than 90 days after sentencing. 18 U.S.C. § 3664(d)(5). Everyone agreed that the court missed that deadline, for no good reason. The question concerned the consequences of that failure.

The Court began by recognizing that not all time limits are the same; they "var[y] depending upon the particular statute and time limit at issue." 560 U.S. at 610. Some limits are jurisdictional, meaning that the expiration of the deadline absolutely prohibits the court from taking the identified action. These are rare. More common are deadlines that the Court calls "claims-processing rules." These regulate the timing of motions or claims brought before the court and must be respected if the affected party alerts the court to the rule (*i.e.*, no action after the deadline is possible, and the error cannot be harmless), but are forfeited if nothing is said. Finally, there are "time-related directives" that are legally enforceable but that do not deprive the judge of the power to take the identified action after the expiration of the deadline if the court finds good cause to do so.

Using this framework, the Court decided that the 90-day limit for determining an amount of restitution was a time-related directive. It offered several reasons for doing so. First, the statute did not specify any consequences for noncompliance with the 90-day rule. The Court also found textual clues

supporting the time-related characterization, insofar as the law was expressly designed to ensure that victims of the covered crimes received restitution. The defendant's interest in knowing how much was owed was distinctly secondary. Another clue along that line was the fact that the statute made provision for later-discovered losses to be added to the restitution order. Last, if a defendant knew that the court was considering restitution and wanted a faster resolution of the issue, he could ask the court directly, using a petition for a writ of mandamus if necessary.

2

Our task is to apply *Dolan*'s guidance to the closely related, though different, area of criminal forfeiture. We begin with the low-hanging fruit: every court of appeals to have addressed the issue has concluded that Rule 32.2 does not establish jurisdictional limitations. The district court believed that it lacked jurisdiction to amend the judgment, but that is not so. The conclusion that we are not dealing with a jurisdictional rule flows from the Supreme Court's consistent position that rules of practice and procedure, such as the Federal Rules of Criminal Procedure at issue here, "do not create or withdraw federal jurisdiction." See *Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 370 (1978); see also *Kontrick v. Ryan*, 540 U.S. 443, 454 (2004) ("Only Congress may determine a lower federal court's subject-matter jurisdiction.").

That leaves the choice between the claims-processing model and the time-related directive model. Before looking more closely at the opinions from our sister circuits, however, a word of caution is in order. Rule 32.2 contemplates two, not one, orders of forfeiture—the preliminary order and the final determination. Nothing says that everything under the

umbrella of Rule 32.2 must be characterized the same way. It is logically possible that the rule creates a time-related directive for preliminary orders, but a claims-processing rule for final orders; it is also possible that both might be time-related, or both might be claims-processing measures. We return to this thought after an examination of the caselaw.

3

The first in this line of cases is *United States v. Martin*, 662 F.3d 301 (4th Cir. 2011), which was decided about a year and a half after *Dolan*. After defendants were convicted on various drug charges, the United States sought asset forfeiture, as it had indicated it would do in the indictment. Before sentencing, the district court held two forfeiture hearings, during which it took evidence on the connection between the crimes and the assets. At the conclusion of the second hearing, the court found that "the government's preliminary forfeiture order is fully supported," and it told the government's lawyer that it would enter the order once a minor modification had been made. The court then moved immediately to sentencing without ever actually entering that order. It entered its judgments against the various defendants between January 5 and January 16, 2007, but it did not enter the "preliminary" order of forfeiture until January 19, 2007. On June 14, 2007, the court issued a final order of forfeiture, but it did not amend the written judgments to reflect that order.

Three years later, the defendants filed a motion to vacate the criminal forfeiture orders and to return all seized property. Their position was that the district court lost jurisdiction to order forfeiture when it missed the Rule 32.2 deadline for the preliminary order. After rejecting the jurisdictional argument, the court turned to the then-recent decision in *Dolan* for

guidance. *Dolan*'s approach, it found, dictated a finding that the timing of a preliminary order under the rule is a time-related directive, not a claims-processing rule. In so concluding, the court looked to the six considerations that *Dolan* singled out. First, the applicable version of Rule 32.2, just like the mandatory restitution statute in *Dolan*, did not specify a consequence for noncompliance. The substantive purpose of Rule 32.2, it continued, "is not to provide protection for defendants but to deprive criminals of the fruits of their illegal acts and deter future crimes." 662 F.3d at 309. Next, the court noted that nothing indicated that the purpose of the Rule 32.2 deadline for a preliminary order was to provide certainty to the defendant about the amount that would be due. Fourth, even though forfeited funds are less certain to compensate victims than funds collected as restitution, forfeited proceeds often do go to victims, who are blameless for any delay that occurred. Finally, the court concluded that the time-related directive characterization was consistent with *Dolan*, and that the defendants could have obtained the certainty they desired by lodging a proper objection at the sentencing hearing.

The court also noted that the 2009 amendment to Rule 32.2 reinforced its conclusion. Focusing on the final order of forfeiture, the rule now says that "[t]he court must include the forfeiture order when orally announcing the sentence *or must otherwise ensure* that the defendant knows of the forfeiture at sentencing." Rule 32.2(b)(4)(B) (emphasis added). We note that the emphasized language makes sense only if there is an alternative to a timely preliminary order.

The next circuit to consider this problem was the Eighth, which disagreed with the Fourth and concluded that the requirement of a timely preliminary order of forfeiture is a

mandatory claims-processing rule. See *United States v. Shakur*, 691 F.3d 979 (8th Cir. 2012). Like the defendants in *Martin*, defendant Shakur had been convicted on drug charges. And like the judge in *Martin*, the judge in Shakur's case failed to enter a preliminary order of forfeiture until nearly three months after entering the judgment. As the rule requires, the governing indictment included specific forfeiture allegations. After the jury returned a verdict of guilty, the court asked the parties whether either one wanted jury findings on forfeiture. A co-defendant did make that request, but Shakur did not. He filed a *pro se* petition contesting six of the forfeiture allegations, but the government failed to file a motion seeking preliminary forfeiture. Perhaps for that reason, the court also failed to conduct a hearing on the contested forfeiture allegations. Only at the outset of the sentencing hearing did the government file a belated motion for a preliminary order, but its motion made no reference to the impending sentencing, nor was it served personally on Shakur. No one paid any attention to forfeiture during the sentencing hearing until the judge announced at the very end that he was "going to enter a forfeiture in this case." 691 F.3d at 986. But he did not really follow through—the written judgment said only that "[f]orfeiture will be imposed by further order of the Court." *Id.*

The government tried to salvage the situation by amending its motion for a preliminary order of forfeiture, but Shakur opposed the amendment, arguing that both the failure to enter a proper preliminary order and the failure to incorporate such an order in the final judgment were non-clerical violations of Rule 32.2 and thus beyond the court's power to fix after the 14-day period provided in Federal Rule of Criminal Procedure 35 had elapsed (as it had done). The court finally entered a "preliminary" order four months after the judgment

had been entered and simultaneously incorporated it into the judgment; Shakur appealed from that order.

If the preliminary order had been entered prior to sentencing, as required by Rule 32.2(b)(4)(B), the court would have been authorized "at any time" to conform the judgment to that preliminary order, using Rule 36. 691 F.3d at 987. But in Shakur's case, "the court … entirely failed to enter either a preliminary or a final forfeiture order before entry of final judgment … ." *Id.* And the court found material distinctions between its case and *Martin*. In *Martin*, the court held two hearings on the subject of forfeiture, and it took evidence at both. In *Shakur*, there was "no pre-sentencing evidentiary forfeiture hearing and no judicial pronouncement of what specific property would be forfeited." *Id.* at 988. The lack of both notice and, just as important, effective procedures to contest the forfeiture, was important to the Eighth Circuit, which listed a litany of problems with the procedures in Shakur's case:

> Here, Shakur timely contested six of the government's Forfeiture Allegations, but his objections were entirely ignored. He was denied timely determination of "the requisite nexus," Rule 32.2(b)(1)(A); a hearing on the contested allegations, Rule 32.2(b)(1)(B); the entry of a preliminary order "directing the forfeiture of specific property," Rule 32.2(b)(2)(A); and entry of that order "sufficiently in advance of sentencing" to allow him to seek revisions, Rule 32.2(b)(2)(B). Finally, after sentencing, he was denied inclusion of a preliminary forfeiture order in his judgment of conviction, Rule 32.2(b)(4)(B), which deprived him of "the right to have the entire sentence imposed as a package and reviewed

in a single appeal," [*United States v. Koch*, 491 F.3d 929, 932 (8th Cir. 2007).]

*Id.* It is hardly surprising, under the circumstances, that the Eighth Circuit found that the forfeiture order could not stand in the face of those omissions. Whether Rule 32.2's preliminary forfeiture provisions are better understood under the claims-processing rubric or as a time-related directive, it seems likely to us that the outcome would have been the same.

Next in line is the Second Circuit's decision in *United States v. McIntosh*, 24 F.4th 857 (2d Cir. 2022), *cert. granted and opinion vacated and remanded*, 142 S. Ct. 2015 (2022), *on remand* 58 F.4th 606 (2d Cir. 2023). (Because there is no material change in the court's discussion of forfeiture between the 2022 and 2023 opinions, we refer here to the 2023 version.) Defendant McIntosh, who had been convicted on Hobbs Act robbery and firearm charges, argued that "the order of forfeiture entered against him should be vacated because the district court failed to enter a preliminary order prior to sentencing, as required by Federal Rule of Criminal Procedure 32.2(b)(2)." 58 F.4th at 608. Finding that the requirement of the preliminary order was a time-related directive, the court found that this was not a reason to vacate the forfeiture (though it did vacate the order on other grounds, see *id.* at 609 n.7).

For the most part, the Second Circuit followed the analysis in *Martin*, noting that Rule 32.2 prescribes no consequences for a missing preliminary order of forfeiture, that its primary purpose is disgorging the wrongdoer's gain (not notice to that person), that there was no prejudice to McIntosh from the delay, and that the Rule itself signals that it is flexible in its provision to allow a judgment to be corrected at any time using

Rule 36 (when a court forgets to include the forfeiture order in the final judgment). Moreover, the defendant-oriented purposes for which the preliminary order is designed were all satisfied here: the district court orally ordered forfeiture at the sentencing hearing; and after a remand the court ensured that McIntosh had an opportunity to object to the order and the court adjudicated those objections.

Finally, we take up the Sixth Circuit's decision in *United States v. Mattux*, 37 F.4th 1170 (6th Cir. 2022), which expressed agreement with *Shakur* and adopted the "claims-processing" interpretation. But, as with *Shakur*, the problems in *Mattux* spread beyond a simple failure to enter a preliminary order of forfeiture. Defendants there had been convicted of committing tax crimes, and the indictment included forfeiture allegations for tens of millions of dollars ($17.5 million for one defendant, $45 million for the other). The question, as in the other cases discussed here, was what to do when "the district court entirely failed to follow Rule 32.2(b)'s requirements." 37 F.4th at 1180. Specifically, the court (1) did not enter a preliminary forfeiture order before either defendant's sentencing, (2) did not unambiguously defer doing so in any general order, and (3) did not even mention a money judgment during one defendant's sentencing, and expressly deferred ruling on "any money judgments" during the other defendant's sentencing. *Id*. The Sixth Circuit was thus unable to "say that the [district] court 'otherwise ensure[d] that' both [defendants] knew—in the same way they would otherwise know had their money judgments been 'orally announc[ed]' in their sentences—that they would still be subjected to money judgments." *Id.*

4

There is a world of difference between the procedural flaws that troubled the Sixth and Eighth Circuits in *Maddux* and *Shakur*, and the situation now before us. The courts had good reason to be concerned in those two cases, because the absence of the preliminary order infected the rest of the proceedings. Critically, in those cases there was also a problem with the court's pronouncement of the judgment, in which the final order of forfeiture was announced. Rule 32.2(b)(4)(B) requires the court to "include the forfeiture when orally announcing the sentence" or otherwise to "ensure that the defendant knows of the forfeiture at sentencing." In addition, the order must be included in the written judgment, though if it is not, that failure is a clerical one that can be corrected at any time pursuant to Rule 36. *Id.* But in *Mattux*, the court did not "include the money judgments [*i.e.*, forfeitures] as 'part of the sentence[s]' announced." 37 F.4th at 1172. Nor did it do so in *Shakur*, where the judgment said only that "[f]orfeiture will be imposed by further order of the Court." 691 F.3d at 986.

In contrast, in *Martin* the defendants were fully aware of both the possibility and the amount of forfeiture, the district court held "multiple, comprehensive hearings on forfeiture," and it announced orally that it was going to order forfeiture. 662 F.3d at 309. *McIntosh* is much the same. Before the final judgment was entered, the district court gave the defendant an opportunity to contest forfeiture, and it included the order of forfeiture in its judgment. As Federal Rule of Criminal Procedure 52(a) puts it, the only error was one that did "not affect substantial rights"—that is, harmless. Little surprise, therefore, that the Eighth and Sixth Circuits opted for a characterization that precluded a later "fix," while the Fourth and the

Second saw no reason not to adopt the more flexible time-related directive approach.

In our view, the best way to reconcile these competing lines of authority is to recognize the difference between the preliminary order and the final order. Rule 32.2 builds in flexibility about the timing of a preliminary rule, when it states that "[u]nless doing so is impractical, the court must enter the preliminary order sufficiently in advance of sentencing to allow the parties to suggest revisions or modifications before the order becomes final as to the defendant under Rule 32.2(b)(4)." Rule 32.2(b)(2)(B). The rule is also flexible about when the preliminary order becomes final—either at sentencing "or earlier if the defendant consents." Rule 32.2(b)(4)(A). We note as well that the rule does not say, in so many words, that there can never be a final forfeiture order without a predicate preliminary order, and we are not inclined to add such language by judicial fiat.[1]

This indicates to us that the requirement of a *preliminary* order is a time-related directive, not a claims-processing rule. A time-related directive should be followed, but as *Dolan* put it, the judge retains "the power to take action to which the deadline applies if the deadline is missed." 560 U.S. at 611. If the missed deadline has not caused prejudice to either party and the purposes of the preliminary order have been fulfilled, the court might choose to exercise that power. Or the court

---

[1] The closest the Rule comes to this is in 32.2(b)(4)(A), which says "[at sentencing—or at any time before sentencing if the defendant consents—the preliminary forfeiture order becomes final as to the defendant." That falls short of saying that the district court lacks power to issue the order at the time of sentencing. It is also notable that the court retains the power to amend or modify the order after sentencing. See Rule 32.2(b)(4)(C).

may deem the absence of a preliminary order an error, but a harmless one, under the circumstances.

The final order is another matter. The requirement that it must be included in the oral judgment of the court has the character of a claims-processing rule. In other words, if the defendant objects to the failure to include forfeiture in the judgment, the court must enforce the rule. If the order is properly announced but is not reflected in the written judgment, the rule permits correction at any time.

5

The problem in Lee's case relates exclusively to the absence of a preliminary order of forfeiture; the court orally announced the forfeiture as part of its judgment. In this setting, as *Dolan* indicates, harmless-error analysis applies. See *United States v. Farias*, 836 F.3d 1315, 1330 (11th Cir. 2016) (holding that failure to enter preliminary order before sentencing was harmless error when court ordered forfeiture at sentencing and gave defendant an opportunity to dispute the amount). We thus turn to the question whether Lee was prejudiced by the absence of the preliminary order here.

The answer, we are confident, is no. Lee knew from the time he read the indictment that the government was seeking forfeiture. The government renewed that notice when it filed a presentencing memorandum asking the court to impose forfeiture. Lee vigorously contested the forfeiture amount before sentencing when he provided his own forfeiture calculations to the Probation Office. In other words, he had his chance to suggest "modifications or revisions" to the proposed forfeiture amount before sentencing, Fed. R. Crim. P. 32.2(b)(2)(B)—precisely what a preliminary forfeiture order

would have guaranteed. Additionally, the court gave Lee ample opportunity to dispute the government's amount at sentencing. And he succeeded in that effort. The court adopted Lee's position and limited forfeiture to his preferred amount, $455,229.23.

The court's pronouncement was not merely a finding that forfeiture in that amount was appropriate (as the court itself assumed in hindsight after sentencing); it was a *final* order of forfeiture. Sentences are legal acts meant to bring finality to the judicial process, and the court's pronouncement must be understood within that context. Because the court was imposing a final sentence at the hearing, it was actually ordering forfeiture, not making a finding on the topic. This is evident when we look at the court's reference to forfeiture while discussing the 18 U.S.C. § 3553(a) sentencing factors. In justifying Lee's below-guidelines sentence, the court stated that Lee is "going to have to pay a very large financial penalty. He's going to be separated from all of his gains." Immediately after, the court sentenced Lee to 18 months in prison. The court could not have made that statement had it not believed that forfeiture had been ordered.

"An inconsistency between an oral pronouncement and the written sentence is a clerical error within the scope of Rule 36. When a written judgment fails to reflect an unambiguous oral pronouncement, Rule 36 allows for correction of such clerical error at any time." *United States v. McClain*, 16 F.4th 487, 490–91 (7th Cir. 2021) (quotations and citations omitted). Because the district court orally imposed the $455,229.23 order of forfeiture in open court, it may now rely on Rule 36 to conform the written judgment to the oral pronouncement.

*United States v. Quintero*, 572 F.3d 351 (7th Cir. 2009), supports this conclusion. There the defendant entered a guilty plea agreeing to forfeit his 1983 Chevrolet Caprice, after which the district court entered a preliminary order. At sentencing, however, "the [district] court neither mentioned the forfeiture of the Caprice nor included the forfeiture in the written follow-up judgment." *Id.* at 352. "The district court found the omission a clerical error under Rule 36; it ordered that the forfeiture provision be included in the judgment … [and] then signed a final order of forfeiture for the Chevy Caprice." *Id.* Quintero argued that the district court lacked jurisdiction to modify his sentence because Rule 32.2(b)(4)(B) states that "[t]he court must include the forfeiture when orally announcing the sentence or must otherwise ensure that the defendant knows of the forfeiture at sentencing." We rejected this reading of the rule because "[t]he district court corrected the criminal judgment to include what everyone intended, expected, and agreed to in the plea agreement." 572 F.3d at 353. To make sure this language did not go unnoticed, we added the following: "[W]e affirmatively rule that the failure to include forfeiture in a judgment, that everyone intended to be included, constitutes a clerical error, correctable under Rule 36." *Id.*

That is just what happened here: it was crystal clear that "[e]veryone intended, expected, and agreed" that forfeiture would be included in the judgment. See *id.* Indeed, at the end of the sentencing hearing the court asked the parties whether there was something it was overlooking, and the parties said no. Lee, of course, had little to quarrel about because he had managed to reduce his forfeiture amount by half. As in *Quintero*, the court's failure to include that order in the written judgment was a clerical error, correctable under Rule 36.

Lee insists that *Quintero* is distinguishable because the district court there entered a preliminary order. But we already have concluded that the failure to enter such an order, while error, is a violation only of a time-related directive, and thus subject to harmless-error review. In Lee's case, the record shows that the court did everything that would have been required had a proper preliminary order been entered:

- The indictment contained notice that the government was seeking forfeiture. Rule 32.2(a).
- No particular property was subject to forfeiture other than Lee's financial gains, and so there was little to no role to be played by Rule 32.2(b)(1)(A).
- The record reflected the amount of forfeiture the government was seeking. Rule 32.2(b)(2)(A).
- No third party had any interest in Lee's proceeds. Rule 32.2 (b)(2)(A).
- The court gave Lee and the government ample time to allow both sides to suggest revisions or modifications. Rule 32.2(b)(2)(B).
- The court's oral pronouncement of the sentence included the specific amount that was subject to forfeiture—the amount advocated by Lee. Rule 32.2(b)(4)(B).

That, we think, is enough to support a harmless-error finding.

The preliminary order of forfeiture contemplated by the rule plays an important role, and omission of such an order may often lead to prejudice. *Shakur* and *Maddux* may be two such cases, but we are not persuaded that either of them helps him. As we already have pointed out in detail, in each of them the district courts not only failed to enter a preliminary forfeiture order, but also failed to provide the defendants with an

opportunity to dispute forfeiture or adequately to address forfeiture at sentencing. *Maddux*, 37 F.4th at 1170 (district court failed to discuss forfeiture at sentencing); *Shakur*, 691 F.3d at 986 (district court stated at sentencing, "I am going to enter a forfeiture in this case" but did not specify the amount). Both courts held that these were errors that could not be corrected after Rule 35's 14-day period elapsed.

Had the district court not ordered forfeiture at sentencing, perhaps our analysis would be different. That is an issue for another day. In this case, the court's mistake was harmless error that can be remedied under Rule 36.

## V

We AFFIRM the judgment of the district court in part. We REVERSE the court's order refusing to amend the sentence to include the forfeiture that it orally ordered and REMAND for the limited purpose of amending the written judgment to reflect the court's oral pronouncement of the order of forfeiture pursuant to Rule 36.